STP CORPORATION, a Delaware corporation, Anthony Granatelli, a citizen of the State of Illinois, and Studebaker Corporation, a Delaware corporation, Plaintiffs,

v.

UNITED STATES AUTO CLUB, INC., an Indiana corporation, Defendant.

No. IP 68C–21.

United States District Court
S. D. Indiana,

Indianapolis Division.

July 2, 1968.

Floyd W. Burns and William E. Plane, Cadick, Burns, Duck & Neighbours, Indianapolis, Ind., Nixon, Mudge, Rose, Guthrie, Alexander & Mitchell, New York City, for plaintiffs.

John M. Kitchen, Rauch, Chase & Kitchen, Indianapolis, Ind., Robert Morgan, Smith, Morgan & Ryan, Indianapolis, Ind., for defendant.

## MEMORANDUM OF DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

STECKLER, District Judge.

The complaint in this case was filed January 18, 1968 by Anthony Granatelli, an individual (Granatelli), and STP Corporation, a Delaware corporation (STP), which was organized January 10, 1968, eight days before the filing of the complaint. STP is a wholly owned subsidiary of Studebaker Corporation (Studebaker) which, by its Board of Directors, on January 12, 1968, authorized the incorporation of STP for the purpose of bringing this action.

The defendant, United States Auto Club, Inc., is an Indiana not-for-profit corporation with its principal place of business in Indianapolis, Indiana.

The complaint is twenty-five pages in length containing seventy-five numbered paragraphs and alleges six causes of action. The allegations in each cause of action are laced to consecutive causes by incorporation. The complaint prays for preliminary and permanent injunction together with damages and upon filing the complaint January 18, 1968 the plaintiffs gave notice of hearing date of March 4, 1968 for preliminary injunction.

Defendant filed its answer on February 23, 1968. This record discloses substantial pre-trial discovery by both parties. Defendant's answer asserted as one of its defenses that Studebaker was the real party in interest. Prior to hearing defendant filed a motion for summary judgment for determination of the real party in interest question. On March 4, 1968, immediately prior to the commencement of the hearing for preliminary injunction, Studebaker filed its consent to be joined as a party plaintiff.

The six causes of action asserted in plaintiffs' verified complaint are as follows:

1. That the defendant, United States Auto Club, Inc. (USAC), breached a contract in refusing to recognize the membership of STP and Granatelli as its president, in USAC for 1968;

2. That USAC acted tortiously in arbitrarily, unreasonably, and unjustifiably advising plaintiffs, STP and Granatelli, that it refused to honor their membership for the year 1968;

3. That USAC breached plaintiffs' contractual rights as USAC members to have the technical specifications which had been met by the STP Turbocar continue in effect for a period of time;

4. That USAC wilfully, maliciously and wantonly committed tortious acts by amending its technical specifications and refusing to honor plaintiffs' membership with the intent to exclude plaintiffs and plaintiffs' STP Turbocar from automotive racing competition;

5. That USAC has used a monopoly power in restraint of trade and commerce by adopting rules and regulations which are neither reasonable nor reasonably related to the attainment of any of the lawful purposes of USAC, and by applying its rules, regulations and technical specifications arbitrarily, capriciously, unreasonably, and discriminatorily against plaintiffs, all in violation of Sections 1 and 2 of the Sherman Act;

6. That USAC together with certain of its members and other persons who do business with said members have

engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in championship auto racing, in violation of Sections 1 and 2 of the Sherman Act.

Defendant's answer is summarized as follows:

1. The first defense that Studebaker is the real party in interest is no longer an issue by virtue of Studebaker's voluntary joinder as a party plaintiff.

2. As to causes one through four, defendant asserts that the Court has no jurisdiction in that the principal place of business of Studebaker is in Indiana, and, therefore, diversity of citizenship is lacking. In this connection defendant's position is that there is no substantial federal question arising out of the fifth and sixth causes of action alleging violation of the anti-trust laws and that the principle of pendant jurisdiction is therefore inapplicable.

3. Defendant asserts laches against equitable relief as to causes three, four, five and six.

4. As to the third cause of action defendant contends that plaintiffs cannot be granted relief from asserted contract rights which plaintiffs contend to arise out of violation of the anti-trust laws.

5. As to the fifth and sixth causes of action defendant contends plaintiffs are barred under relief having acted *in pari delicto*.

6. The material factual allegations of the various numbered paragraphs in the respective causes of action are denied by the defendant.

The hearing commenced March 4, 1968 and, with the exception of one-half day, consumed sixteen trial days and was concluded in the afternoon of March 25, 1968. The record in this case exceeds thirty-four hundred pages and contains more than three hundred exhibits.

Plaintiffs' case was submitted through the pre-trial deposition of Mr. Thomas W. Binford, President of the defendant, United States Auto Club, Inc., the pretrial deposition of Mr. Henry Banks, Director of Competition of the United States Auto Club, Inc., and Mr. Granatelli, the individual plaintiff, who was the only live witness for the plaintiffs.

The defendant's case was submitted through the testimony of Mr. Binford and Mr. Banks, both of whom were in Court throughout the trial, Mr. Paul Baynes, an Allison engineer who testified as an expert on turbine engines, Miss Frances Welker, an employee of the Indianapolis Motor Speedway, Mr. Roger McCluskey, a race driver and member of the defendant's Board of Directors, and Mr. Macura, a Ford Motor Company engineer, all of whom testified in open court. The defendant also submitted as a part of its case the depositions of Mr. Stanley B. Feuer, corporate secretary of Studebaker Corporation, and Mr. Kenneth B. Wallis, a resident of California.

There are two essential issues in the case:

1. Membership rights of plaintiffs in the defendant organization which plaintiffs assert have been unlawfully denied.

2. A change in the engine specification for turbine powered cars which defendant effected by its Board of Directors following the 1967 500 Mile Race on the ground of providing a competitive equivalency of this type of engine with piston engines as prescribed for championship class cars. The plaintiffs contend that such rule change was unlawful. In connection with this issue, plaintiffs' complaint alleges that plaintiffs had a right to operate the turbine powered car either under an unlimited engine specification (without restriction as to size) or under the specification in effect for the 1967 500 Mile Race, until 1971. Notwithstanding such allegations, plaintiffs' counsel on the next to the last day of trial took the position that,

for purposes of the hearing on their application for temporary injunction, plaintiffs were seeking relief and contending only for the right to run the turbine powered car in the 1968 500 Mile Race under the engine specification rule existing for the 1967 500 Mile Race.

The cause is submitted for hearing on the application for preliminary injunction before the Court, without the intervention of a jury. The parties appeared personally and by counsel and the Court having heard the evidence, examined the exhibits, considered extensive pre-trial and post-trial briefs and heard arguments of counsel, is fully advised in the premises.

As hereafter set out in the special findings of fact and conclusions of law, the Court is of the opinion that it has jurisdiction of the parties and the subject matter of each of the causes of action.

■ With respect to jurisdiction of the subject matter, the defendant sought to show that jurisdiction of the subject matter was lacking on the ground that Studebaker Corporation had its principal place of business in South Bend, Indiana on January 18, 1968, the date of the filing of the complaint. Notwithstanding the fact that certain corporate functions were still being carried out in South Bend, Indiana, the Court is of the view that corporate policy and decisions were determined for the Studebaker Corporation from its offices in Harrison, New Jersey, and, therefore, "a corporate nerve center" was at that location and complete diversity of citizenship in fact existed. Sabo v. Standard Oil Company of Indiana, 295 F.2d 893 (7th Cir. 1961); United Nuclear Corporation v. Moki Oil and Rare Metals Co., 364 F.2d 568 (10th Cir. 1966).

■ Defendant also raised the defense of laches. The Court is of the view that following the 1967 500 Mile Race on May 30 and 31, 1967 (the race having been postponed the first day because of rain) and from June 26, 1967 when the turbine engine specification was changed by the USAC Board of Directors, there were open issues between the parties and areas of dispute for meetings of the parties to resolve their differences which they were unable to do. At no particular time could the Court determine to be the commencement of a period beyond and from which the plaintiffs would be guilty of laches in not bringing legal action, and, therefore, finds that the plaintiffs are not guilty of laches.

■ There is also the issue as to whether plaintiffs suffered irreparable injury to entitle them to equitable relief. The evidence establishes that plaintiffs proceeded to make arrangements to and undertook the building or construction of turbine powered cars for the 1968 racing season under the 15.999 square inch annulus USAC specification adopted in June of 1967. Further, the evidence establishes that others proceeded to prepare turbine powered cars for the 1968 USAC events under the 15.999 inch rule. With such facts, the Court is of the opinion that irreparable injury to plaintiffs cannot be found to entitle them to equitable relief and further that greater injury would result from granting of equitable relief than the denial of such relief. In this regard the Court cannot overlook the harm that could be done to others if the Court were to ignore the right and power of USAC, the sanctioning organization, as a membership club to adopt new rules or to make changes in its rules and thus have some semblance of continuity of its governing rules and constancy in rules that are reasonably adopted and have not been invalidly changed.

The plaintiffs have contended that once a rule is adopted that it is binding for a given period of time and have contended for a one, two, three or five year period, as the case may be. However, any such policy contended for by the plaintiffs the Court believes relates to the change of all engine specifications of all championship class related to the "keystone" engine, being the 4.2 litre

non-supercharged overhead cam shaft engine. This makes logical sense to the Court.

■ USAC is a sanctioning organization and has the right to legislate to perpetuate its existence and provide for competitive equivalency among all types of engines and no court has the right to step in and dictate to a sophisticated group of officials, duly elected, in a sanctioning organization which sanctions sports and in particular as in this instance a sport that is attended with grave hazards. Such rule making functions must be delegated to the powers of the governing body of that group and a court should interfere only if it finds that the powers were exercised in an unlawful, arbitrary or malicious fashion and in such a manner as to affect the property rights of one who complains, none of which the Court finds to be so in this case.

The Court finds that the action taken by USAC authorities in their effort to bring forth an equivalency formula for turbine powered engines was not unreasonable. A membership organization such as USAC as a voluntary organization or one of a social nature of sports organization must be left to legislate its own rules and its own guidelines for participation of its members for the purposes for which it was created so long as that legislation is not done in an unreasonable manner and without malice or intention to harm a single member or segment of membership. Such membership organizations have the right to adopt such rules to protect their very existence.

■ In the Court's view, with respect to this type of an organization, the controversy presented calls for the application of the rule of reason and the Court finds that USAC acted reasonably in its rule making function and in such case such action should not be overturned by the Court. One of the purposes of USAC is to encourage the sport of automobile racing, which is a highly competitive sport of a very technical nature.

The quickest way to bring about the demise of racing would be to permit a situation that developed for one car with superior qualities or such superior capabilities as to eliminate competition. It would be somewhat like allowing one basketball team to have a large hoop at one end of the court and a small regulation size basketball hoop at the other end for the other team. In order to have a continuation of racing the Court concludes that USAC acted reasonably in trying to bring about an equivalency between the piston powered automobiles with turbine powered cars according to a formula that was prepared and submitted after consultation with those who are considered most expert in the field. The defendant consulted an impressive group of experts from various companies and the USAC Board had before it reasonable basis upon which to conclude and determine a 15.999 inch annulus area specification for turbine powered cars. The making of competitive rules is something that any governing body of an organization such as USAC has a right to do. Such action goes to the very purpose of its existence, i.e., to encourage competitive racing.

■ The plaintiffs have asserted violation by the defendant of the anti-trust laws, Sections 1 and 2 of the Sherman Act. Although I realize that USAC as a sanctioning organization is a rule making and an officiating body and does not engage in the trade or business of automobile racing, and although a real difference of legal opinion could exist, I consider that in viewing the defendant's activities in their entirety, they are such as to make the defendant subject to the anti-trust laws and the Court so finds. However, as set out in the special findings of fact and conclusions of law following this memorandum of decision, the Court finds that USAC does not have a monopoly nor did it conspire or combine to monopolize. This record falls short of establishing a combination or conspiracy and the Court finds that USAC did not engage in any concerted action or activity in combination or in

conspiracy in violation of the anti-trust laws.

The plaintiffs have asserted that defendant has either denied or refused membership of STP Corporation as the successor to the STP Division of Studebaker Corporation. The Court finds from the evidence before it that there is no basis to find and conclude that USAC acted unlawfully or unreasonably in not granting STP Division of Studebaker Corporation as a matter of course, membership and the rights attendant to membership in USAC. In this regard, the Court finds no evidence that USAC has denied membership to any of the plaintiffs or that any of the plaintiffs have been expelled from USAC membership. There is no evidence in this record to indicate action expelling either Mr. Granatelli, STP Corporation or Studebaker Corporation from membership in USAC.

 In view of the history of the controversy between Anthony Granatelli and USAC concerning alleged false product use for certification and car construction rules violation relating to the alleged addition of fuel tanks to Car No. 40 after qualifying the car for the Indianapolis 500 Mile Race, together with and in particular the threat of multiple litigation, the Court finds that USAC acted reasonably in not granting membership to STP as a matter of course without the benefit of an informal meeting or formal meeting between the Board of Directors of USAC or the Executive Committee of USAC, with or without attorneys present, as sought and invited by USAC through its Director of Competition. From the evidence, the Court finds that Anthony Granatelli and STP have repulsed all efforts on the part of USAC to have such a meeting, but instead they chose to litigate the question of their rights to membership in USAC in this proceeding and join such controversy with the other claims asserted in the complaint before the Court regarding the other rule changes.

 The Court finds that USAC did not act unreasonably in conditioning the renewal of plaintiffs' STP membership upon acknowledgment on the part of STP or Anthony Granatelli and STP Division of Studebaker Corporation of the rule making power of USAC and the cessation of threatened harassment and ruinous litigation. The Court recognizes that such rule making power is subject to due process procedures and must be exercised according to the duly adopted constitution and by-laws of the United States Auto Club, Inc.

 Thus, the Court finds and concludes that the plaintiffs are not entitled to preliminary injunctive relief on the first and second causes of action since the evidence shows that they have not pursued nor attempted to pursue the remedies available to them within USAC, pursuant to its By-Laws. Plaintiffs' request for preliminary injunction, or injunctive relief, enjoining USAC from denying plaintiffs the right attendant to membership in USAC is therefore denied.

The Court considers that principles enunciated in the following cited cases as applicable and controlling with respect to the defendant organization as a voluntary organization and the issue of plaintiffs' membership relating to the failure to exhaust its administrative remedies and defendant's right to protect its organizational existence: State of North Dakota v. North Central Association, 23 F.Supp. 694 (E.D.Ill.1938), affirmed 99 F.2d 697 (7th Cir. 1938); Parsons College v. North Central Association, etc., 271 F.Supp. 65 (N.D.Ill. 1967). See also State ex rel. Givens v. Marion Superior Court, 233 Ind. 235, 117 N.E.2d 553 (1954); Randolph v. Leeman, 129 Ind.App. 134, 146 N.E.2d 267 (1958); Supreme Council of the Order of Chosen Friends v. Forsinger, 125 Ind. 52, 25 N.E. 129, 9 L.R.A. 501 (1890).

The Court does not consider cases cited by plaintiffs, being Grillo v. Board of Realtors, 91 N.J.Super. 202, 219 A.2d

635 (1966) and Falcone v. Middlesex County Medical Society, 34 N.J. 582, 170 A.2d 791 (1961), as being applicable here.

Although the Court will not issue an injunction ordering USAC to bestow membership or attendant rights to membership upon plaintiffs, in view of the defendant's position in offering to meet with the plaintiffs, which plaintiffs refused to do, under the equity powers of this Court, I am ordering the parties to have a meeting at their mutual convenience with regard to the membership of STP in the defendant organization.

### SPECIAL FINDINGS OF FACT

1. Plaintiff, Anthony Granatelli (Granatelli), is and has been since prior to 1962 and at all relevant times a salaried employee of Studebaker Corporation (Studebaker) and now resides in Des Plaines, Illinois and is a citizen of the State of Illinois.

2. STP Corporation (STP) is a Delaware corporation organized on January 10, 1968 for the purpose of bringing this suit. STP is a wholly owned subsidiary of Studebaker Corporation (Studebaker) and prior to its incorporation was operated as a division of Studebaker. The incorporation of STP effected no change in its operations. STP is primarily engaged in the marketing of an automotive oil treatment under the name "STP" which is blended and canned for STP by others. STP does no manufacturing. The Paxton Division of STP produces a line of superchargers and commercial air blowers for a variety of automotive and industrial applications and is also engaged in engineering high performance vehicles for automotive racing.

3. Studebaker which filed its consent to and was joined as a party plaintiff in this action on March 4, 1968, the first day of the hearing in this cause, is a Delaware corporation, wholly owned by Studebaker-Worthington, Inc., under agreements effected on or about November 28, 1967.

4. Defendant, United States Auto Club, Inc. (USAC), is a not-for-profit corporation organized and existing under the laws of the State of Indiana. USAC was incorporated September 16, 1955 to take over the functions of the Contest Board of the American Automobile Association (AAA) when that organization ceased sanctioning automobile racing competition. The essential function of USAC is officiating at atuomobile racing events throughout the United States by contract with promoters who meet the safety and other requirements of USAC and who agree to conduct the competition under the supervision of USAC approved officials and under the USAC rules and regulations.

5. USAC membership is made up of (i) active participant members, including race drivers, mechanics, promoters, car owners and officials who take an active part in racing; (ii) life members; (iii) honorary members; (iv) corporate members; (v) representatives of manufacturing companies; and (vi) fan or non-participating members who are interested in racing but do not actively participate in events. USAC imposes many safety regulations not only with respect to the running of racing events, but with respect to cars, engines, drivers and equipment. It licenses drivers and mechanics, car owners or entrants who are members of USAC. USAC sanctions races in its various racing divisions which are the (i) championship car division; (ii) sprint car division; (iii) stock car division; and (iv) midget car division. It licenses cars which participate in the respective divisions in accordance with the car and engine specifications prescribed for the respective divisions. Under special arrangements it also acts as a sanctioning organization to certify results of product use and in special events, such as the land speed events at the Bonneville, Utah Salt Flats and the Mobil Economy Run.

6. The only material source of income to USAC is from sanction, membership and license fees. USAC has no financial investment in any commercial activity associated with automobile racing. It owns no racing facilities and

does not promote any events or races. It does not advertise events it sanctions. It does not sell tickets or receive receipts from ticket sales. It does not own, sponsor or operate any race cars. It does not contract for or receive any revenue from advertising or radio or television coverage of racing events and has no control over any such activity although racing events sanctioned by USAC have been broadcast by radio and television pursuant to independent agreement made by others with promoters of such races, which broadcasts have reached states other than that in which the race has been held. USAC does not exercise control nor seek to exercise control over any arrangements or agreements between accessory companies and car owners or drivers. It has nothing to do with or exercise any control over arrangements, financial or otherwise, between car owners and drivers or mechanics. It has nothing to do with or does it exercise any control over arrangements or agreements between car owners and sponsors of cars. USAC's sole activities in connection with racing events consist of providing stewards and other officials from its membership and in establishing safety and competition rules for officials, cars, drivers, mechanics and other participants in the conduct of races which it sanctions. Licenses must be secured annually from the Director of Competition before drivers, mechanics, reliefs or assistants, car owners or cars may enter sanctioned competitions. Licenses expire each November 30th. Licensees must be USAC members except non-members may be licensed to participate in USAC events which are listed by the F.I.A. Driver qualification requirements and mechanics requirements and car registration requirements are specified in the USAC Official Competition Rules. USAC requires that racing facilities of promoters under USAC sanctioning agreements comply with USAC safety specifications and it inspects facilities to determine compliance. Promoters are required to carry public liability and property damage insurance in accordance with USAC requirements. USAC provides group insurance and other benefits for participants engaged in racing events sanctioned by USAC. USAC under its sanctioning agreement requires guaranties or other assurance from promoters for the protection of drivers or participants with respect to the payment of prize money.

7. By reason of USAC safety rules, regulations and licensing requirements and to assure promoters under sanctioning agreements of the caliber of equipment and proficiency of drivers and other participants, USAC rules provide that no person or group of persons licensed or accredited by the United States Auto Club shall participate in, associate with, or in any way lend himself to any competition not sanctioned by USAC, without written permission from the Director of Competition. Permission to participate in a non-sanctioned event will not be granted if that event is deemed by the Club to be in competition with the USAC sanctioned event. Notwithstanding such requirement this record shows that top drivers who are USAC members, such as A. J. Foyt, winner of the 1967 500 Mile Race, and Parnelli Jones, who drove Car No. 40, the turbine powered car, in the 1967 500 Mile Race, involved in this suit, and others have been permitted to run in many non-sanctioned USAC events where their appearance at sanctioned events has not been anticipated by promoters. Moreover, in sanctioned USAC events many drivers who are not members of USAC, and car owners not members of USAC, have participated if the drivers are members of other recognized sanctioning organizations and demonstrate their competency by driver's tests and the cars meet USAC specifications for any such event. The best example of this, in this record, is found in the participation by the many foreign and United States drivers and cars who are members of other sanctioning organizations in the Indianapolis 500 Mile Race in 1967.

8. Automobile race cars which participate in USAC sanctioned events are entered by the owners by independent agreement with promoters. A number of such cars may be transported across state lines both prior to and subsequent to such races by the car owners. Car owners likewise contract with qualified drivers for participation in racing events over which USAC exercises no control. USAC does not contract with owners or drivers or sponsors of cars for participation in racing events.

9. There are numerous other organizations in the United States engaged in sanctioning automobile racing events by contract with promoters in the same manner as USAC, including the National Association of Stock Car Auto Racing (NASCAR), Sports Car Club of America (SCCA), National Hot Rod Association (NHRA) and other organizations referred to in this trial. Only USAC sanctions races for new USAC National Championship type cars or new Indianapolis type cars.

10. USAC, SCCA, NHRA and NASCAR are all sanctioning organizations in the United States, each of which through representation on the Automobile Competition Committee of the United States (ACCUS), a not-for-profit New York corporation, has, in turn, representation in the Federation Internationale de l'Automobile (F.I.A.). F.I.A. is essentially an international listing or scheduling organization, the purpose of which is to schedule full international events and to permit qualified foreign drivers to participate in listed international races without the necessity of membership in the United States sanctioning organizations. Neither F.I.A. nor ACCUS sanctions races in the sense of providing officials and safety rules and regulations for the conduct of the event, all of which functions are delegated to a respective sanctioning organization. F.I.A. licensed drivers may participate in any F.I.A. listed event.

11. At every racing event sanctioned by USAC it selects officials to conduct the race according to USAC rules of competition, including all rules and safety regulations.

12. USAC exercises no control whatsoever over racing events not conducted under sanctioning contract between USAC and a promoter. In 1967 USAC sanctioned approximately 134 racing events of which approximately 116 were run in the USAC sprint, stock car and midget divisions. Approximately 21 were in the championship division, including the Indianapolis 500 Mile Race, which is a full international event listed by F.I.A. There were about 25 full international events listed in the United States by F.I.A. in 1967 of which USAC sanctioned 5, NASCAR sanctioned 6 or 7, and SCCA sanctioned approximately 10.

13. The promoters of the racing events rather than USAC perform such functions as assigning garages, assigning pit areas, assigning space to accessory companies in garages, garage and pit areas, issuing credentials to accessory companies' personnel, prize donors, car sponsors and others for access to garages and pits, and soliciting and accepting entries to the racing events. At the Indianapolis Motor Speedway, credentials are issued to accessory companies' personnel regardless of USAC membership, the only standard being that the product be used or useful to a race car. Less than 10% of credentials issued to approximately 9000 people were issued to USAC for its re-issue to participants.

Of particular significance is that after about May 1, at the Indianapolis Motor Speedway, each morning the track (not the entire Speedway) is turned over to USAC for it to officiate at practice runs, qualifications and the race, and each night is turned back to the Indianapolis Motor Speedway.

*Findings as to USAC Rules and Organization:*

14. The Official Competition Rules of USAC, which include the By-Laws and the car and technical specifications

for championship car division pertinent here, expressly provide that USAC reserves the right to revise its rules or any supplements thereto at any time. The rules apply to every automotive competition, trial or test, which USAC sanctions. The rules provide that USAC shall exercise the right to authorize and supervise automotive competitions and tests of any kind; to make and construe rules for and to render decisions concerning them; to grant, refuse or withdraw licenses, sanctions and approvals; to establish standards of eligibility for participation in competitions; to establish rules for its own procedure; and "to do any and all things which, in its judgment, are consistent with the enhancement of automotive competitions."

The rules further provide that "every person or group of persons who undertakes to organize or participate in any automotive competition under the sanction of the United States Auto Club shall be deemed to be acquainted with these rules and his application shall constitute his acceptance of them."

15. The USAC rules further expressly provide that:

"The connection of the United States Auto Club with competitions is advisory and not executive. Its regulations are promulgated for the improvement and stabilization of the activity, and are without responsibility or profit. Every track owner, promoter, car owner, driver, mechanic, or other person applying for licensing or receiving a license or being permitted to participate in a competition, and any person accepting an official appointment or acting in any official capacity in connection with any competition sanctioned by the United States Auto Club formally agrees to be bound by these regulations and by any modifications of them, and recognizing that automotive racing is a hazardous undertaking, assumes all of the risks by reason of his participation and/or association with automobile racing, and does for himself, his heirs, executors, administrators, successors and assigns, release and discharge the United States Auto Club and its respective stewards, officials, agents or administrators, successors and assigns for any and all liability for personal injuries that may be received, and from all claims and damages for injury to person or property growing out of or resulting from any race, races, or any other competitions whatsoever, including qualifications, practice runs and/or exhibitions or other appearances whether contemplated or held under these rules or caused by any construction or condition of any track or tracks, equipment, cars or other devices used therefor or by reason of any alleged cause or condition of any nature whatsoever."

16. The Board of Directors of the United States Auto Club is its governing body and makes all rules and regulations with respect thereto and determines its policies and practices.

17. USAC has approximately 4480 members of which approximately 2450 are active members, being drivers (approximately 483 in all divisions), mechanics (approximately 1035 in all division), promoters (approximately 43 in all divisions), car owners (approximately 485 in all divisions), officials (approximately 413). Non-participant members or fan members total approximately 1600. There are 271 life members; 25 honorary members; 36 corporate members and 79 manufacturer's representatives other than corporations.

18. The Board of Directors of USAC is composed of 21 members, 7 of whom are elected representatives from the respective active groups, viz. one each from drivers, mechanics, promoters, car owners, midget car division, sprint car division and stock car division. 7 members of the Board are life members among whom are Thomas W. Binford, President of United States Auto Club, and Anton Hulman, Jr., President of Indianapolis Motor Speedway.

Corporate members have no right to representation on the Board of Directors nor do manufacturer's representatives. Since this controversy involves the plaintiffs as the owner of a race car being a turbine powered car, Car No. 40, of particular significance as hereinafter shown, is the fact that J. C. Agajanian was the elected representative of the car owners on the USAC Board of Directors in 1967.

19. Thomas W. Binford at all relevant times and since 1957 has been President of USAC and a member of its Board of Directors (Binford). Binford is a business man who serves on several business Boards of Directors and is active in many civic endeavors. He is interested in automobile racing and serves as President and a Director of USAC without compensation. As President of USAC he has no right to vote as a Director except in case of a tie.

20. Henry Banks is the USAC Director of Competition who administers the affairs of USAC and it is his responsibility to enforce the rules and regulations of the Club, issue licenses and sanctions and maintain the records. Mr. Banks is neither a director nor officer of USAC.

*Findings With Respect to the Issue of Jurisdiction:*

21. Studebaker Corporation was joined as a party plaintiff on March 4, 1968, the commencement date of the hearing in this cause. Studebaker is a Delaware corporation. Historically, the headquarters of Studebaker have been in South Bend, Indiana. On or about November 28, 1967 Studebaker and Worthington, Inc. became wholly owned subsidiaries of a parent corporation, Studebaker-Worthington, Inc. Studebaker remained as a separate corporate entity.

Stanley B. Feuer, Secretary of Studebaker and Secretary of STP, testified in his deposition that on January 18, 1968, the date of filing of the complaint, the headquarters of Studebaker Corporation were in Harrison, New Jersey; that all physical corporate records were kept in New Jersey and that corporate policy decisions emanated from those offices.

*Findings Relating to Relief Sought and Defendant's Rules:*

As heretofore stated, and as a predicate for following findings plaintiffs' position as stated by its counsel in open court on March 22, 1968 (contrary to certain allegations in plaintiffs' complaint) is that plaintiffs, in this hearing, are only seeking relief to run "the turbine engine that ran in last year's 1967 500 race (and that it) be permitted to race in this year's race." (Tr. 3220)

22. Only two rule changes were made by defendant following the 1967 500 Mile Race which would affect turbine powered cars for entry by plaintiffs in the 1968 500 Mile Race—(i) the change in the turbine engine specification reducing the annulus area (air intake) of the turbine from 23 square inches to 15.999 square inches, which reduces the power potential of the engine, and (ii) prohibition in the use of an air brake flap. Mr. Granatelli testified that if the only rule change had been that relating to the air brake flap, this action would not have been instituted. Thus, the only material issue before the Court relates to the change in the turbine engine specification.

23. A fact which apparently is not generally recognized, is that the defendant since its inception and its predecessor AAA before it have, at all relevant times, had limitations on sizes of engines competing in the respective racing divisions. Such engine specifications which are pertinent here, relate to the championship division and are set out in defendant's car and technical specifications. For such division there are some eight engine specifications which are designed to provide competitive equivalency. The key or "keystone" engine from which other engine sizes are and have been determined for competitive equivalency is the non-supercharged overhead cam shaft engine which is and has been since 1957 limited in size to 4.2 litre. The supercharged

overhead cam shaft engine specification is 2.8 litre. Similarly, the other specifications are established for American stock block engines (supercharged and non-supercharged), diesel, turbine, two-stroke cycle engines and rotating combustion engines.

24. As hereinafter more fully set out in these findings the defendant in March of 1966, prior to the time that any turbine powered car had competed in any USAC sanctioned event, initiated a study to determine a turbine engine specification to provide competitive equivalency with the piston powered cars. In September of 1966 the defendant's Rules Committee recommended to the Board that turbine powered cars be banned from USAC sanctioned events. The defendant's Board of Directors rejected such recommendation and adopted a specification for turbine powered cars and set the 23 inch annulus area rule. Plaintiffs' Turbocar, Car 40, powered with a Pratt-Whitney turbine engine with an annulus area of approximately 21.9 square inches, was entered in the 1967 500 Mile Race. Although it did not win the race, going out because of gear box trouble in about the 197th lap of a 200 lap race, it led for approximately 171 laps, set a new one lap speed record by more than 5 miles an hour and was driven under instructions to the driver to hold down the speed all during the race. It demonstrated such superior performance that the piston engine cars could not compete with it and "could not race with it."

Following the 1967 500 Mile Race, USAC Rules Committee meetings were held on June 6, 1967, at which Mr. Granatelli was present and all parties interested, including Mr. Granatelli, urged prompt resolution of the turbine engine specification. A turbine evaluation committee was appointed to report to the USAC Board of Directors at a Special Meeting. On June 12, 1967 notice of special meeting was given to be held June 26, 1967, which fully set out the purpose of such meeting to consider the turbine engine specification. On June 26, 1967 at the special meeting of defendant's Board of Directors, the turbine engine specification was changed by reducing the annulus area from 23 square inches to 15.999 square inches, such rule to become effective January 1, 1968.

25. Plaintiffs had full knowledge of such proposed meeting and its purpose to consider the turbine engine specification from and after the June 6, 1967 Rules Committee meeting. In addition, such knowledge is further evidenced by correspondence from Mr. Granatelli, Mr. Burlingame, then President of Studebaker, and Mr. Guthrie, as counsel for Studebaker, to USAC officials during the period prior to such meeting.

26. Following the action of defendant's Board, June 26, 1967, the plaintiffs had knowledge as early as July and August of 1967 and continuously thereafter until, January 1, 1968 (effective date of the turbine engine specification rule change) of the intentions and plans of others to design and build turbine powered race cars for the 1968 500 Mile Race under the new turbine engine specification, being the 15 inch rule adopted June 26, 1967, and of the fact that race cars with reciprocating engines would be prepared for entry in the 1968 USAC National Championship racing events. The evidence discloses the entry of four turbine powered race cars, three by one entrant and one by another for the 1968 500 Mile Race, such entries setting out turbine engine specifications in compliance with the 15 inch rule, and the entry of cars with reciprocating engines for such race.

Disputes between the parties as to the defendant's rules and compliance by plaintiffs continued and were unresolved after a meeting requested by plaintiffs and held December 7, 1967. The Court is unable to determine any particular time from or after which plaintiffs could be considered as guilty of laches in not bringing action until the filing of the complaint January 18, 1968.

*Findings Relating to Plaintiffs' Failure to Show Irreparable Damage and No Right to Equitable Relief:*

27. The evidence in this case is undisputed that plaintiffs are producing turbine powered race cars for entry in the 1968 500 Mile Race which will be in compliance with the defendant's 15 square inch annulus rule and in compliance with defendant's chassis configuration, Rule 40. Further, that plaintiffs have available a turbine engine for installation in plaintiffs' Car 40 which can comply with such 15 inch annulus area rule. As hereinafter found, the Car 40 chassis as presently designed can be operated in the 1968 500 Mile Race without the brake flap. Such plans for turbine powered cars for entry in the 1968 500 Mile Race were made under arrangements with Colin Chapman as early as October of 1967. Granatelli knew of the Pratt-Whitney engine which could be used to meet the 15 square inch rule in such cars and for Car No. 40 in December of 1967 which was confirmed to him at least by January 20 to January 23, 1968 within approximately five days after the filing of the complaint in this cause. Based upon such facts, the Court finds that plaintiffs are not and could not be irreparably damaged by any act or rule of the defendant USAC and, therefore, are not entitled to equitable relief.

28. The Court finds that the injury to defendant and third parties would be greater if equitable relief were granted than the injury to the plaintiffs if equitable relief were denied.

*Findings Relating to Plaintiffs' Membership in USAC:*

29. STP Division of Studebaker was a corporate member of defendant in 1967 and in prior years. The evidence does not disclose that Granatelli was an individual member of defendant at any relevant time since 1962 or 1963. STP Corporation formed January 10, 1968, has not been and is not now a member of defendant and has not applied for membership in defendant for the year 1968.

30. Plaintiffs assert that advertising of their products in connection with USAC sanctioned events is vital to their business and that membership in defendant is a prerequisite to such advertising. However, membership in USAC is not required for anyone to sponsor a race car in a USAC sanctioned event, including the Indianapolis 500 Mile Race, nor is membership required in order for anyone to advertise a product at or in connection with a USAC event.

The evidence discloses that plaintiffs have sponsored cars and advertised products in many types and kinds of racing events including those sanctioned by defendant and by other sanctioning organizations without showing of any requirement of membership and in fact has advertised its products and had representatives in the pits at a USAC sanctioned event at Phoenix, Arizona, in January of 1968 when its membership was an issue in this case.

The evidence is undisputed that credentials for pit passes and garage areas were issued to Studebaker representatives for the 1967 500 Mile Race by the Indianapolis Motor Speedway without inquiry or regard to USAC membership.

31. Upon request USAC will certify the product usage in a car in a USAC sanctioned event in which case membership in USAC is required. To so certify the request must be made to defendant's representatives prior to 8:00 A.M. on the morning of the race. In the 1967 500 Mile Race STP Division of Studebaker through Granatelli's representative requested product certification by the defendant in 27 cars entered in the race of a total of 33, but did not request certification for Cars No. 14 and 4, driven respectively by A. J. Foyt and Joe Leonard. Car 14 driven by Foyt was the winner of the 1967 500 Mile Race. STP decals were not displayed on either such car (nor is membership required to do that). Granatelli testified that decals were not on Foyt's car because of

his supersitition. The evidence does not disclose that Leonard was similarly supersititious. Foyt was paid STP prize money for winning the 1967 500 Mile Race. Plaintiffs advertised Foyt's Car No. 14 as using STP in such race. STP decals were placed on the car after the race for photographs and advertising purposes.

32. About June 2, 1967 Henry Banks called a meeting to determine the matter of use of STP in Foyt's Car No. 14 in the 1967 500 Mile Race. Tests to determine use of STP in Foyt's car were inconclusive. Granatelli testified that Foyt was "holding him up" with respect to payment to use Foyt's name for advertising STP, and that he met Foyt's deal the morning of the race. In view of the failure to request product certification for such cars prior to the race Granatelli asked Banks to "cover for him" which Banks refused to do.

USAC thereafter sought to determine and substantiate such product usage in the Foyt and Leonard cars in view of plaintiffs' advertising in violation of defendant's rules. Upon defendant's request, affidavits were furnished by plaintiffs but defendant was not satisfied with such proof. Granatelli and Foyt, Sr. and Foyt, Jr. were requested to appear at the USAC Board meeting in September, 1967 with respect to such matter but refused to do so. Defendant by letter dated September 29, 1967 advised Granatelli:

"During the course of the September 15, 1967 USAC Board of Directors meeting, product and material usage and advertisement thereof in USAC sanctioned events, was discussed at great length. Certain suspected violations to Rule 15.1.1 by accessory firms were reviewed, one of which concerns the STP Division of Studebaker Corporation in conjunction with the 1967 Indianapolis 500 Mile Race.

"It was disclosed, from evidence presented, that the STP Division was in violation of certain parts of this rule at Indianapolis this year. Nei-

ther you nor your representatives notified the USAC Certification or Technical Committees that STP Oil Treatment would be used in cars #4 and #14 driven by Joe Leonard and A. J. Foyt, respectively, prior to the race. As a result, our records do not substantiate your claim; an awkward position for both of us.

" * * * *

"I am directed by the USAC Board to notify you that the foregoing investigation regarding the use and advertisement of STP products per rule 15.-1.1 remains an open issue with the USAC Board and future action will depend on your compliance with USAC rules. This probationary period will continue until such a time the USAC Board is satisfied the STP Division of the Studebaker Corporation is functioning in accordance with the USAC rules governing product use and advertisement in connection with USAC sanctioned events."

33. In September of 1967 Banks learned of allegations that an additional fuel tank or tanks were placed in Car 40 after its qualification but before the 1967 500 Mile Race in violation of defendant's rules. Granatelli denied such violation in testifying in this cause. The record does not disclose that defendant ever notified plaintiffs of defendants's knowledge of such violation until this suit.

34. On December 7, 1967, a meeting called by Mr. Granatelli was held in the offices of counsel for USAC in Indianapolis. Mr. Granatelli was present, and he was represented by counsel. Also present at such meeting representing USAC were Messrs. Binford, Banks, Cloutier and counsel for USAC. The evidence discloses that counsel for plaintiffs stated that unless agreement could be reached whereby plaintiffs could race a turbine powered car with an annulus area of at least 17 plus inches (as then proposed by Granatelli) that plaintiffs intended to file multiple lawsuits against defendant, meaning a suit would be filed in advance of each USAC sanctioned

event in 1968 leading up to the 1968 500 Mile Race. The record discloses that there are four such events prior to the Indianapolis 500 in four different states and that plaintiffs did not enter any of such events in 1967 and in prior years have regularly entered only the Indianapolis 500 Mile Race. The type of complaint which plaintiffs intended to file was described by counsel: They would put in enough paragraphs that various judges would find something of interest in them. The evidence with respect to the foregoing is undisputed in this record.

USAC is a not-for-profit corporation and the only fair or reasonable inference is that such multiple suits constituted a threat of harassment and intention to destroy the defendant unless it capitulated to the plaintiffs' demands.

35. Plaintiffs' corporate application for 1968 membership being for STP Division of Studebaker is dated December 8, 1967, the day following the foregoing meeting.

36. January 4, 1968 Banks wrote to Granatelli stating in part:

"After carefully considering your 1968 United States Auto Club corporate membership application, I am disposed to deny it at this time. I have discussed this matter with Mr. Binford and we desire to have an informal meeting with you within the next week or ten days, and thereafter a formal hearing with the full Board, if necessary, on this subject. If you prefer, the formal hearing could be arranged with the Executive Committee. You may have your attorneys present at any such meeting, if you wish.

"* * *

"We are concerned not only with your threat of lawsuits, but also the threat of multiple lawsuits announced by your corporate attorneys at the December 7, 1967 meeting, called by you at Mr. Kitchen's office. It is felt that so long as this situation and threats of litigation exist it would be difficult to justify acceptance of your corporation application for membership in the United States Auto Club, Inc. nor issuance of licenses."

37. Banks and Granatelli met in Chicago on or about January 6, 1968. Banks advised Granatelli of the January 4, 1968 letter from USAC which Granatelli had not yet received. Granatelli refused to come to any USAC Board or Executive Committee meeting. Banks denies, and the Court accepts Banks' testimony denying Granatelli's statement, that he (Granatelli) was told in Chicago that unless plaintiffs would agree not to sue the defendant then there was no point in coming to Indianapolis.

38. Defendant USAC did not deny plaintiffs' application for membership which it had a right to do in view of the December 7, 1967 meeting, but on the contrary sought plaintiffs' attendance at a hearing in connection with the membership issue.

In view of the history of the controversy between Anthony Granatelli and USAC concerning alleged false product use for certification and car construction rules violation relating to alleged addition of fuel tanks to Car 40 after qualifying the car for the Indianapolis 500 Mile Race, together with the threat of multiple litigation, USAC acted reasonably in not granting membership to STP as a matter of course and without the benefit of an informal meeting or a formal meeting between the Board of Directors of USAC or the Executive Committee of USAC, with or without attorneys present, as sought and invited by USAC through the Director of Competition. Defendant USAC did not act unreasonably in conditioning the renewal of plaintiff STP's membership upon an acknowledgment on the part of STP, Granatelli or STP Division of Studebaker Corporation of the rule making power of USAC and the cessation of threatened harassment and ruinous litigation. The Court recognizes that such rule making power is subject to due process procedures that must be exercised according

to the duly adopted constitution and by-laws of defendant.

39. The USAC By-Laws, Article XX, specifically provide for appeals to the USAC Board of Directors from a decision of the Director of Competition. Plaintiffs did not avail themselves of such rights, even assuming plaintiffs' position that their corporate application for membership had been denied.

40. Neither the Director of Competition nor the general counsel of USAC has any final authority to deny membership in USAC to any applicant, which fact is found in the By-Laws of USAC and was at all relevant times known to plaintiffs.

*Findings With Respect to Car and Engine Specifications and the Change in the Turbine Engine Specification:*

*Defendant's development of turbine specification through September 12, 1966.*

41. As heretofore stated USAC since its organization and its predecessor AAA at all relevant times have had engine specifications limiting the size of engines in race cars in the respective racing divisions including the championship division. Such specifications limit the engine size and are based upon the key or "keystone" engine, as described in this record (first so characterized by Mr. Granatelli), which is the non-supercharged overhead cam engine, which is limited to 4.2 litre piston displacement. Supercharged overhead cam engines are limited to a smaller size, 2.8 litres. Similarly, the specifications provide for engine sizes of stock block engines, supercharged and nonsupercharged, diesel, turbine, two-cycle engines and rotating combustion engines.

The basis for such specifications is to provide competitive equivalency. USAC does not limit the type of fuel that may be used or restrict fuel flow. Although there is a minimum weight requirement for cars for safety reasons, there is no handicapping of particular types of cars by weight penalty, all such fuel and weight restrictions being considered artificial handicaps. The theory is to limit the size of the engine and then permit the ingenuity of car builders, mechancis and drivers to develop the best racing machine within such specifications.

42. USAC rules also specify a chassis configuration and size limitations for racing cars, some of which rules are in issue by plaintiffs' complaint but not now considered material to the Court's determination in view of the statement of plaintiffs' counsel made in the course of this hearing and heretofore referred to.

43. Prior to September of 1966 the USAC engine specification for turbine engines was "unlimited." In 1962 the first turbine powered car was entered in the Indianapolis 500 Mile Race but was withdrawn prior to qualification. In 1966 a turbine powered car was brought to the Indianapolis 500 by Demler but was also withdrawn prior to qualification.

In March, 1966 anticipating the possibility of the entry of turbine powered cars in the future and before defendant USAC had any knowledge of plaintiffs' interest in developing a race car with a turbine engine, the USAC Executive Committee authorized Banks to develop a turbine engine specification.

To this time no turbine powered car had ever competed in USAC racing events. Banks, following the authorization in March of 1966, sought and obtained the help of Paul Baynes, a turbine expert in the employ of the Allison Division of General Motors in Indianapolis who undertook to study the matter of developing a turbine engine specification for championship division race cars to prepare a report for the USAC Board of Directors. Baynes served without compensation. During the summer of 1966 Baynes undertook such study starting with a then existing F.I.A. formula for turbine powered race cars which as fully disclosed by the evidence is complicated and was determined not to be feasible for application to USAC racing events. Moreover, such F.I.A. formula

was determined to be too difficult to police. Baynes also used information supplied by Banks with respect to horsepower of then reciprocating engines used in USAC championship car events.

44. September 7, 1966 the Rules Committee of USAC recommended to the Board that turbine engines "not be permitted in USAC events." September 12, 1966 the USAC Board met and rejected the recommendation of the Rules Committee and based upon Baynes' report directed Henry Banks to determine a turbine specification (based upon charts prepared by Allison engineers presented at the meeting) equivalent to a 600 horsepower reciprocating engine on a standard Air Force day of 59 degrees.

45. The USAC Board at the September 12, 1966 meeting expressly reserved the right and provided "that should these turbine engines prove detrimental, the Board could later act to prohibit their use."

46. Based upon the standards set by the Board at the September 12, 1966 meeting, Banks with Baynes' assistance and the charts then available promptly established a turbine engine specification by limiting the size of the annulus area (the air "intake") not to exceed 23 square inches. Based upon Baynes' recommendation, for safety reasons, and without suggestion from USAC, the Board also approved the requirement of a containment shrouding to be placed around the "hot section" of turbine engines.

*History of Plaintiffs' Development of Turbine Powered Race Car.*

47. In 1965 commencing in March or April of that year, Granatelli employed Kenneth B. Wallis who was then in the employ of Douglas Aircraft to help as a consultant in connection with the fuel problems in Granatelli's Novi engines which he acquired in about 1961 and were in turn purchased by Studebaker from Granatelli in 1963. After such date Granatelli individually had no further investment in any race cars pertinent here, including the Turbocar No. 40.

Wallis was a turbine engine expert and had been employed in England and in this country in work involving jet engines in aircraft. A year or two prior to the time he became associated with Granatelli he attempted to interest others in the development of a turbine powered race car but without success. During the early period of his association with Granatelli, Wallis furnished him with information which he had developed proposing a turbine powered race car. Wallis became a full time employee of Paxton Products, a Division of plaintiff, Studebaker, to work with Granatelli in December of 1965, and continued to urge Granatelli to produce a turbine powered car.

In February of 1966, through prior contacts of Wallis with United Aircraft of Canada, Wallis and Granatelli went to that company to interest it in supplying a turbine engine in a program to develop a turbine powered race car. In late February or March of 1966, United Aircraft loaned a turbine engine to Granatelli for "mock-up" purposes for a ninety-day period with the understanding that the engine would remain inoperable and would be used only in existing Novi chassis for test bed purposes. Such loan agreement was later extended from time to time but the engine was to remain inoperable. The turbine test project was abandoned in March or April of 1966, when a chassis being developed by Wallis for Granatelli for possible alternate use for either a Novi engine or a turbine engine, was destroyed in a heat treating process. From that time through the 1966 500 Mile Race all efforts by Granatelli were devoted to the Novi powered race car for the 1966 500 Mile Race.

About July 4, 1966, following the 1966 500 Mile Race, Granatelli first obtained budget authority from Studebaker to develop a turbine powered race car.

Shortly prior to that date and about June 26–28, 1966, Granatelli met Banks in Atlanta, Georgia at a USAC race at which time Banks told him of the USAC study to determine a turbine engine specification for USAC championship race cars. Grantelli asked Banks to send him the information in connection with the F.I.A. formula which Banks did. Later Granatelli advised Banks by telephone that he (Granatelli) did not want the F.I.A. formula for USAC events. In June, 1966 in the Atlanta conversation between Banks and Granatelli, Granatelli advised him of his interest in developing a turbine powered car but did not advise Banks of the size or type of engine that he was considering.

*Period Following September 12, 1966 after Adoption by USAC of the 23 Inch Specification for Turbine Engines.*

48. Following the September 12, 1966 USAC Board meeting and the adoption of the 23 inch annulus rule, Banks by telephone advised Granatelli of such rule and that the Board had reserved the right "that should these turbine engines prove detrimental, the Board could later act to prohibit their use."

At about that time Banks learned from Granatelli that his proposed turbine engine was a Pratt-Whitney engine ST6B and that it fell within the 23 inch annulus rule, having an annulus area of approximately 21.9 inches.

49. The turbine engine such as the Pratt-Whitney had never been used in cars and as shown by this record had only been used in airplanes, helicopters, boats and locomotives such as the one pulling trains at Expo 67 in Montreal.

50. Although design work had been undertaken by Granatelli through Wallis during the late summer of 1966, Granatelli did not order the construction of the turbine powered car which became Car No. 40 until on or about October 1, 1966. This was after the adoption and after Granatelli knew of the adoption of the 23 inch annulus engine specification for turbine engines by the USAC Board at the September 12, 1966 meeting and the express reservation by the Board at that meeting, "that should turbines prove detrimental, the Board could later act to prohibit their use."

Granatelli did not purchase the turbine engine for Car 40 until November 4, 1966.

51. During December, 1966, and January, 1967, Granatelli complained of the containment shrouding rule adopted by the USAC Board in September, not because of weight as contended during the trial of this cause, but because of the size of the metal shrouding for installation in the car which he was then constructing, which became the Turbocar No. 40. The USAC Board in January, 1967 authorized substitute material of comparable strength to that previously required which gave Granatelli relief from the space problem in connection with the containment shrouding.

52. Notwithstanding a question of interpretation of USAC Rules 7 and 40 relating to chassis configuration of Car No. 40, such rules were interpreted by the USAC Technical Committee to permit Car No. 40 to run in the 1967 500 Mile Race. Such rule interpretations were not reviewed or acted upon by either the USAC Rules Committee or the USAC Board of Directors at that time.

*1967 Indianapolis 500 and June, 1967.*

53. Prior findings set out the fact that Car No. 40 qualified and ran in the 1967 500 Mile Race and demonstrated a performance so "vastly superior" to the piston powered cars that there was in fact no competition. The turbine engine in Car No. 40 was "uptrimmed" meaning an increase in the fuel flow beyond the manufacturer's specifications and in excess of 105% of such specifications which would increase the power potential of a 23 square inch turbine engine above the power as rated by the manufacturer from approximately 600 horsepower to a range of 700 to 750 horsepower. Such action by plaintiffs was not in violation of any USAC rule but

was not known to USAC in June, 1967 when it reconsidered equivalency and adopted the 15 inch rule. In fact, Mr. Granatelli advised the USAC Rules Committee on June 6, 1967 that the car had been operated within the manufacturer's specifications. Such evidence does demonstrate the ingenuity and unrestrained competitive efforts and the fact that the rule making function must rest with those having broad experience in racing competition such as found on the USAC Board of Directors.

54. Following the 1967 500 Mile Race, USAC Rules Committee meetings were held on June 6, 1967 and as a result of such meetings a turbine evaluation committee was appointed consisting of Messrs. Banks, Baynes, Porter (USAC Board member), and Rhiman Rotz (a USAC Board member and then Chairman of the USAC Rules Committee).

55. Plaintiffs' complaint asserts and plaintiffs have contended throughout the trial of this cause that they have a contract right or a right based upon policy or practice of USAC to run the turbine powered car for a period of one, two, three or five years, and that plaintiffs' Car 40 was built in reliance upon such right or policy. This position is asserted notwithstanding the express reservation of the USAC Board in September, 1966 at the time of the adoption of the 23 square inch turbine engine specification, "that should these turbine engines prove detrimental, the Board could later act to prohibit their use," and the fact that plaintiffs did not order the construction of Car 40 nor the purchase of a turbine engine for Car 40 until after such September, 1966 action by the USAC Board.

In addition to the fact of such express reservation by the USAC Board, the evidence in this record is undisputed that at no time prior to the USAC Rules Committee meeting June 6, 1967, following the 1967 500 Mile Race, did Granatelli or Studebaker Corporation make known to USAC officials either in writing or orally that they claimed a right to run a turbine powered car either under the unlimited formula existing power to September of 1966 or under the 23 inch engine specification rule adopted in September of 1966 for any time period, such as a one, two, three or five year period.

The first time that plaintiffs indicated any such position was Mr. Granatelli's statement in the Rules Committee meeting June 6, 1967 that his "legal position" was that he had the right to run the turbine powered car for a two-year period.

The Court expressly finds that plaintiffs did not rely upon any such asserted contract right, policy, custom or practice of USAC in developing or building Car No. 40 and further that no such contract right, policy, custom or practice in fact existed, nor could it in the face of the express reservation by the USAC Board adopted in September of 1966.

56. At the USAC Rules Committee meeting June 6, 1967 and thereafter, prompt resolution of the matter of turbine engine specification was urged by all interested parties including Granatelli.

June 12, 1967, written notice of a special meeting of the USAC Board was issued fully setting out the purpose of the meeting to consider the matter of the turbine engine specification.

57. Between June 6 and June 26 of 1967, the turbine evaluation committee on which Mr. Paul Baynes, the turbine expert from Allison Division of General Motors was serving, met with turbine experts from Ford, Chrysler and United Aircraft of Canada, the supplier of the turbine engine used in Car No. 40. A written report of the information obtained by the committee was prepared June 24, 1967 for submission to the Board of Directors. Such report outlined twenty informational items obtained from the respective turbine experts with reference in such report to the source of such information. The experts were in conflict on certain of such points. The report concluded with a recommendation that the USAC Board

consider a 25% reduction in the annulus area for turbine engines and further that fuel for turbines be restricted to methanol (straight alcohol).

58. June 26, 1967, a special meeting of the USAC Board was held. The meeting lasted for six to seven hours. The written report of the turbine evaluation committee was available for each member of the Board and was reviewed. A fourteen page letter from Mr. Granatelli with attached performance chart and data information was reproduced and was available for each member of the Board. Mr. Baynes was present to answer questions. The evidence is uncontradicted that the discussion at the meeting concerned determination of an equivalency formula for turbine engines and that there was no consideration of banning turbine engines from USAC racing.

The recommendation of the turbine evaluation committee was not adopted, at least in part, because such recommendation was tied to a fuel restriction for turbines. USAC does not have and has never had a restriction as to the type of fuel to be used in race cars. In addition, the recommendation that turbines use straight alcohol would have constituted a weight handicap in that alcohol has approximately one-half of the B.T.U. content of kerosene which is normally used as a fuel in turbine engines; therefore, a turbine powered car would have had to carry almost twice as much fuel if restricted to straight alcohol to run the same distance. This would have constituted either a weight handicap or necessitated additional pit stops for a turbine powered car.

In addition to Mr. Granatelli's information relating to horsepower and torque characteristics of turbine engines and others, data charts were available through Mr. Baynes reflecting torque and horsepower information with respect to existing Ford racing engines. This record shows and the Court finds that Ford reciprocating engines in the 1967 500 Mile Race had a power poten-

tial in the 480 to 490 horsepower range on straight alcohol (without the use of nitro). The record is also uncontradicted through Mr. Banks and Mr. Granatelli that ten horsepower in this operating range is insignificant.

59. The USAC Board at its June 26, 1967 meeting concluded to "limit turbine engines to an inlet annulus area of 15 square inches, with no water or water-alcohol injection permitted, effective January 1, 1968." The motion was made by Herb Porter, seconded by Bob Higman and passed by an 8–6 vote.

Of particular significance here in view of the plaintiffs' contention of combination and conspiracy under the anti-trust laws, and the assertion of vested interests controlling USAC, is the fact that there are four members on the Board of Directors who are car owners. Only one such member was at the meeting and that was Mr. Agajanian who was serving as the elected member of the car owners on the Board. Mr. Agajanian voted against the resolution reducing the annulus area to 15 square inches (which under standing practice when a fraction is not stated permits the size to go to 15.999).

At the June 26, 1967 meeting the Board acted through resolution moved by Mr. Cloutier that public notice be given to all concerned that the turbine specification adopted is subject to review and possible change after one year. Plaintiffs knew of the Board action promptly after the meeting through wide publicity given the meeting by news media and also by Bulletins subsequently issued by USAC.

60. The action by USAC in adopting the 15 inch annulus rule was taken at a Board of Directors meeting duly called and held after lawful notice. The Board action was taken after full consideration of the facts then known and with consideration of the then state of the art with respect to turbine engines and the possibility of increase in power potential by "uptrimming" the engines to racing form. As previously found,

the power potential of the engine in Car 40 was increased by increasing the fuel flow in excess of 105% of the manufacturer's specifications. Such information was not known to the USAC Board in June, 1967, nor known until this litigation.

61. The action of the USAC Board in adopting the 15 square inch annulus rule for turbine engines at its meeting June 26, 1967 was taken after due consideration and with the purpose and intent of providing competitive equivalency between turbine powered cars and reciprocating engines in racing and such action and the adoption of such rule was not done wilfully, maliciously, or with the intent to harm or damage plaintiffs.

62. July 15, 1967 the USAC Board amended its rules by deleting Rule 7 and amending Rule 40 to read in part as follows:

"40. CHAMPIONSHIP CAR CONSTRUCTION—All national championship cars must be of the open wheel, open cockpit type. No portions of the body or body streamlining or fuel tank may extend beyond the line longitudinally connecting the inside edge of the wheels. The cockpit opening must be at least 500 square inches measured on a plane parallel to the ground and level with the uppermost point of the body or wind screen. If a cage-type rollbar is used, none of the structure may encroach upon an imaginary cylinder extending upward from the cockpit opening.

"The body must give the appearance of completely covering the car's frame and must be fully painted. The engine must be covered with a cowling and/or hood secured in place by means which have the approval of the Technical Committee. The hood or cowling need not enclose the sides of the engine. THE ENGINE MUST NOT PROTRUDE BEYOND THE HOOD SIDES OR TOP. Car construction shall incorporate a floor board or underpan for the entire length of the car. It will be permissi-

ble to have an opening under the center section or transaxle, and under the engine with not more than one-half inch clearance around the circumference of the bottom of the engine. Any opening under a transmission or transaxle must be covered with a one quarter inch mesh screen. All rear engine cars must have the transaxle enclosed within the body. The minimum weight of all national championship cars must be 1350 pounds not including the weight of fuel, oil, water or driver, nor may ballast be added to make up a weight differential. SPOILER WINGS WILL NOT BE ALLOWED ON CARS COMPETING IN USAC SANCTIONED EVENTS. (This is also for sprint and midget type events.) No attachments or devices which are movable that are designed to affect air flow will be allowed."

The Board at such July 25, 1967 meeting also expressly provided:

"That any championship car which has competed in a USAC event in 1967 prior to July 25, 1967 and does not comply with Rule 40 as amended will be permitted to have its engine extend out to a longitudinal line connecting the outer edge of the wheels until January 1, 1969 after which it must comply in full with Rule 40 as amended."

The foregoing action by the USAC Board in July, 1967 intended to clarify and avoid conflict in interpretation of Rules 40 and 7 which existed in connection with the inspection of Car 40 prior to the 1967 race. The action expressly permitted Car 40 to run as it was in the 1968 race insofar as the chassis configuration was concerned.

The action of the Board in the July, 1967 meeting banned the brake flap such as appeared on Car 40 as being a "spoiler" or "spoiler wing" within the contemplation of the rule which had existed prior the the 1967 race. Mr. Granatelli testified that had the only action of USAC been to ban the brake flap this

suit would not have been brought and such action of the USAC Board is therefore not considered material to the Court's determination.

The action of the USAC Board July 15, 1967 as above set out was taken for the purpose of clarifying previous rules and was not done wilfully, maliciously or with intent to harm or damage plaintiffs.

63. January 13, 1968 the USAC Board adopted a rule change providing that the over-all width of championship cars be increased from 75 inches under the existing rule to 85 maximum inches, such rule to be effective June 15, 1968 until January 1, 1969.

Such rule change does not affect cars for the 1968 500 Mile Race and expires by its terms before any subsequent 500 Mile Race.

The evidence in this case shows that the plaintiffs have not raced on what is termed the "Championship Trail" meaning other USAC racing events during the racing season other than but including the Indianapolis 500 Mile Race. Since 1961 or 1962 plaintiffs have entered cars in USAC racing events other than the Indianapolis 500 only on five or six occasions.

The Board at such meeting January 13, 1968 also adopted a rule that effective June 15, 1968 rim widths for wheels would be limited to 10 inches for the front and 14 inches for the rear. Up to this date the rim width limitation was 9½ inches. Similarly this rule change does not affect cars for the 1968 500 Mile Race.

The action of the USAC Board at its meeting January 13, 1968 was taken to make USAC cars more competitive in road racing events and such rule changes were not made wilfully, maliciously or with intent to injure or damage plaintiffs.

*Findings With Respect to Alleged Violations of the Anti-Trust Laws:*

64. Plaintiffs allege in their complaint that defendant violated Sections 1 and 2 of the Sherman Act but without specific allegation as to any co-conspirator or other party with whom defendant is asserted to have combined.

In the course of the trial of this cause plaintiffs have attempted to show conspiracy and combination by the defendant with either Ford Motor Company or Champion Spark Plug Company or both by inference of a vested or dominant interest of either or both such companies affected by the running of the plaintiffs' turbine powered car.

There is no evidence in this record nor any showing even by remote inference to support a finding of conspiracy or combination between USAC and Ford Motor Company, Champion Spark Plug Company, or either of them or anyone else. To the contrary the evidence shows that Ford Motor Company has done no development work on the Ford engine used in race cars since about 1965 and that the horsepower potential of the Ford engine has remained the same since that time.

The name of Champion Spark Plug Company comes from testimony of Mr. Granatelli as to a conversation with a Mr. Jones, in which Mr. Jones indicated reluctance in giving Mr. Granatelli information as to certain dynamometer tests. There is no showing that Mr. Jones was speaking other than as an individual — nor is his relationship, official capacity or authority with respect to Champion Spark Plug Company disclosed.

Moreover, as set out in prior findings, the action of the USAC Board at the June 26, 1967 meeting in adopting the 15 inch annulus area rule was by a vote of 8–6 and the only car owner present, Agajanian, voted against the adoption of such rule.

The Court expressly finds that neither USAC nor its officials combined or conspired with either Ford Motor Company or Champion Spark Plug Company or acted in concert with either of them or with anyone else, in adoption of any of the USAC rules set out in these find-

ings, including the adoption of the 15 inch annulus area rule for turbine powered engines at the June 26, 1967 Board meeting.

65. No witness other than Mr. Granatelli appeared to testify in open court in this cause on behalf of plaintiffs and such witnesses could have included officers of Studebaker, Mr. Cowley from United Aircraft, whose name was continuously referred to in this record as the Pratt-Whitney turbine expert, Mr. Parnelli Jones, the driver of Car 40 in the 1967 500 Mile Race, or Mr. Bignotti, a mechanic familiar with Ford engines. The Court, therefore, infers the fact that testimony of any such witnesses or others that could have been called by plaintiffs would have been adverse to the plaintiffs.

66. The Court further finds that as to the plaintiffs, defendant USAC is not a trade association, but a sanctioning organization organized and operated for the purpose of making and enforcing safety and competitive rules for the conduct of automobile racing events as a sport for those events that it sanctions and provides officials to enforce such rules in its various divisions, i.e., championship car, sprint car, stock car and midget divisions.

Membership in USAC is not essential to the trade, business or livelihood of any of the plaintiffs.

67. In the case of automotive racing events, as in the case of other sporting events, amateur or professional, of which the Court can take judicial notice, business firms advertise and promote their products in connection therewith.

As stated by plaintiffs here, they are not in automobile racing to make a profit. Corporate members or manufacturer's representatives who may be members of defendant USAC have no representation on the defendant USAC Board of Directors. In this case any such firm may and this record discloses that they do freely, without any requirement of membership, sponsor race cars and advertise and promote their products at USAC sanctioned events.

The business of promoting the races and the business of advertising at such events are separate and distinct from the running of the race and officiating at the sporting event, which is essential to the survival of the sport and the maintenance of the integrity of the sport in the eyes of the public.

68. Only in the event of request by any such organization for certification of product usage in a particular racing event is membership in USAC required. Such requirement of USAC is a reasonable one designed to enforce fair and truthful advertising with respect to such product usage in USAC events. This record discloses that the Federal Trade Commission has upon occasion requested information from the defendant USAC with respect to advertising to confirm defendant's certification of product usage.

69. Defendant USAC sanctions events in various racing divisions, designated by the type and kind of car, i.e., sprint, midget, stock, and including those designated as the national championship cars. Championship cars are known by that name by reason of body configuration known as open wheel, open cockpit race cars (as distinguished from sports cars) and engine size. Such cars, however, are within the USAC specifications of all types and designs, front engine, rear engine, "side by side" as in the case of Car 40, and powered by any engine within the eight specifications for such cars.

While the evidence tends to establish that championship class racing as here involved constitutes a separate relevant market for anti-trust purposes, the evidence fails to establish that USAC's sanctioning of such races, so far as the plaintiffs here are concerned, could have any more than an indirect, insubstantial, fortuitous effect upon plaintiffs' business in interstate trade and commerce. The evidence here is that there are many automobile racing sanctioning or-

ganizations and cars and drivers who are members of USAC who may and have participated in racing events sanctioned by other such organizations and drivers who are F.I.A. licensed or members of other sanctioning organizations, in good standing with USAC, and who are qualified but many of whom are not USAC members do race in USAC championship divisions sanctioned events. The defendant USAC has not, nor has it attempted to unlawfully monopolize, nor has it combined or conspired with any persons to monopolize automotive racing or any division thereof, and the Court so finds.

All statements in the memorandum of decision preceding these specific findings, which statements refer to the evidence, and the facts adduced or those of mixed law and fact, are incorporated herein as findings of fact.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties.

2. Diversity of citizenship exists between all plaintiffs and the defendant USAC and this Court has jurisdiction of the subject matter of this suit under the provisions of 28 U.S.C., Section 1332.

3. Defendant, United States Auto Club, Inc., is a voluntary not-for-profit association, organized and operated as an integrated organization to make safety and competitive rules for automotive racing events which it sanctions at which it provides officials to enforce such rules and regulations. Membership in defendant USAC is a privilege and not a right, and one who joins or seeks to join such voluntary association or club, submits to its membership requirements and its rules and regulations.

4. No contract exists entitling plaintiff, Studebaker Corporation, or its Division STP, or plaintiff, STP Corporation, as successor to such Division of Studebaker, or Mr. Granatelli, individually, to membership in defendant, United States Auto Club, Inc.

5. Courts will not interfere with the internal affairs of an association except in case of fraud, illegality or violation of a civil or property right.

6. Membership in defendant is not a civil right.

7. As to the plaintiffs, the defendant is a purely voluntary association, free to fix qualifications for membership and to provide for termination of membership of those who do not meet the standards fixed by the defendant. The constitution, by-laws and rules of government of the defendant measure the rights and duties of the members and defendant may condition membership upon any matter or deny membership entirely so long as rudimentary due process procedures are followed, and exclusions, suspensions, or expulsions from membership are reasonable, done in good faith, and are not discriminatory.

8. Insofar as the issue of membership in defendant is concerned, plaintiffs have not exhausted their internal administrative remedies in connection with their membership under the By-Laws of the defendant USAC.

9. Plaintiffs are not guilty of laches in bringing this action.

10. No regulation, rule, custom, practice or contract existed upon which plaintiffs could have or did rely in building plaintiffs' Car 40, entitling them to operate such car under any rule or engine specification, or formula for any period of time such as a one, two, three or five year period, nor could there be in view of the express provisions of Sections 1.2, 1.6 and 1.7 of the defendant's Official Competition Rules and the express reservation of defendant "that should these turbine engines prove detrimental, the Board could later act to prohibit their use" adopted September 12, 1966, which express reservation was known to plaintiffs before ordering construction of Car 40 or purchasing a turbine engine therefor and to which plaintiffs made no objection.

11. Plaintiffs have not and will not suffer irreparable damage since they are preparing turbine powered race cars under defendant's current rules applicable to the 1968 500 Mile Race and no material property right is affected or violated and plaintiffs are not entitled to equitable relief.

12. Greater injury will result to defendant and third parties by granting equitable relief than will result to plaintiffs if equitable relief is denied.

13. Defendant in adopting its rules, rule changes or modifications, including the adoption of its rules relating to the turbine engine specification, did so in a reasonable and prudent manner with due consideration and its actions were not arbitrary, capricious, malicious or with wilfulness or intent to injure or damage plaintiffs.

14. The Court concludes that in consideration of all of the acitivites of USAC and its mode of operation that, in general, it is within the reach of and subject to the anti-trust laws. However, the Court does not consider that the adoption, modification or change from time to time by defendant of its rules for safety, competitive reasons or those relating to the conduct of racing events, which are equally applicable to all participants, impose any obstruction or obstacle and have not or do not appreciably affect interstate trade or commerce, the effect thereof being at best indirect and remote, and such rules and regulations for such purposes within such areas do not rise to dignity for measurement or are they within the proscription of the anti-trust laws.

15. Defendant USAC did not contract, combine or conspire in restraint of interstate or foreign trade or commerce in violation of Sections 1 or 2 of the Sherman Act.

16. The defendant USAC did not monopolize, attempt to monopolize or combine or conspire to monopolize any part of such trade or commerce in violation of Section 2 of the Sherman Act.

17. The law is with the defendant and against plaintiffs.

18. Any finding of fact deemed to be a conclusion of law is concluded as a matter of law and any mixed finding of fact and law concluded as a matter of law is concluded as a matter of both law and fact.