**John KOSZELA, Jr. and Carl Stevens, Plaintiffs-Appellants,**

v.

**NATIONAL ASSOCIATION OF STOCK CAR AUTO RACING, INC., Defendant-Appellee.**

**No. 269, Docket 80–7138.**

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1980.

Decided April 3, 1981.

---

Bradford Gorham, Providence, R. I., for plaintiffs-appellants.

Brenda A. Eckert, Hartford, Conn. (Peter W. Benner, Shipman & Goodwin, Hartford, Conn., on brief), for defendant-appellee.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This controversy arises out of two stock car races held in New York and Connecticut in late 1973. John Koszela, Jr., the owner of the race car in question, and Carl "Bugs" Stevens, his driver, claim in this diversity action that the failure of the defendant, National Association of Stock Car Auto Racing, Inc. (NASCAR), to adhere to its own rules and regulations governing race procedure and protest adjudication wrongfully deprived them of victories in both of the races. The United States District Court for the District of Connecticut, Blumenfeld,

J., granted summary judgment in favor of NASCAR and the plaintiffs appealed. We affirm.

## BACKGROUND

Construing the pleadings and supporting papers in favor of the plaintiffs, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), the district court concluded that a reasonable jury could have found the following facts.

### A. *The Parties*

NASCAR, a for-profit corporation organized under the laws of Florida, promotes and sanctions stock car racing throughout the United States, including Connecticut and New York. In furtherance of its sanctioning function, NASCAR promulgates a number of rules governing nearly every facet of stock car racing. Participation in NASCAR-sanctioned events requires membership in NASCAR and compliance with its rules. The court found that, as a result of its sanctioning and licensing activities, NASCAR dominates stock car racing in this country and that "[t]hose who want seriously to participate in the sport 'join' NASCAR and pay annual fees for 'membership' and licensing." This membership, however, does not carry with it a right to share in the control of NASCAR's affairs or to elect NASCAR officers. Membership merely entitles the member to seek a license to participate in NASCAR-sanctioned events.

Plaintiff John Koszela, Jr., a citizen of Rhode Island and a member of NASCAR, owns racing cars and has been involved in stock car racing for over 20 years. He earns substantial sums from prize money, commercial endorsements based upon his racing record, and the sale of racing equipment. Plaintiff Carl "Bugs" Stevens, a citizen of Massachusetts and also a member of NASCAR, was Koszela's race car driver during the period in question.

### B. *The Races*

#### 1. *Shangri-La*

On June 23, 1973, the plaintiffs participated in a 100-lap, NASCAR-sanctioned

race at Shangri-La Speedway in Owego, New York. Stevens, driving Koszela's car, trailed in second place for most of the race. On the 94th or 95th lap, Stevens passed the leader, Richie Evans, but before the lap was completed, the yellow caution flag was displayed, requiring the cars to hold their positions and proceed with caution until the green flag is again shown. While the cars were "running" under the yellow flag, a track official directed Evans to pull back in front of Stevens. Immediately thereafter, the green flag was displayed, the last five laps were raced, and Evans received the checkered flag,[1] with Stevens close behind. After the race, Stevens complained that the two lead cars should not have been realigned. After a meeting between Stevens, Evans, and the third-place finisher, in which all seemed to agree that the realigning was improper, the Chief Steward of the track, Harold Keck, ruled that Stevens was the winner and Evans handed the trophy to Stevens. Shortly thereafter, however, Evans complained that the repositioning was proper and that he was the rightful winner. Keck, uncertain what to do, left the first and second place boxes empty and referred the controversy and the prize money to NASCAR headquarters in Daytona Beach, Florida.

NASCAR referred the matter to Competition Director Lin Kuchler, who ruled that Evans was the winner, since (1) Evans was placed in the lead by a track official and therefore had no choice, (2) Evans was the first car over the line on the 100th lap (the "checkered flag rule"), and (3) Evans could not be penalized by a lap or time penalty after the completion of the race. Koszela, who had been unaware that the Shangri-La controversy was being decided, sought re-consideration of the decision and a chance to present his side of the story. Kuchler, however, reaffirmed his decision and notified Koszela of Stevens' right to appeal the decision to the National Stock Car Racing Commission in Daytona Beach. The plaintiffs did appeal and on November 7, 1973, the Commission held a hearing to consider the dispute.

At the hearing, Koszela and his lawyer were not allowed to be present while other witnesses testified and were not allowed to cross-examine. Koszela objected to these rules, but agreed to abide by them. During the course of the hearing, the Commission members heard from both Chief Steward Keck and Koszela. Keck testified as to what local track rules were in effect at Shangri-La that day and what he could recall had occurred. Koszela, who had not been present at the Shangri-La race, testified as to what Stevens and others told him had taken place. After much testimony had been given, a question arose concerning a local track rule.[2] A Commission member telephoned Jerry Bowen, the official NASCAR starter at Shangri-La, who said that he personally had realigned the cars "because of procedures at the driver's meeting" and "because of the fact that when the yellow flag came out, ... Bugs was not past Richie enough to [f]ind basic reason to put Bugs in the lead ...." J. App. 163. Even though the latter reason for realigning was contradicted by the testimony of Keck and Koszela, the Commission ruled that Evans was the winner because Stevens had not completely passed Evans before the yellow flag came out. The plaintiffs sought review by the National Stock Car Racing Commissioner (National Commissioner), but

---

1. The NASCAR rules provide that "[w]hen checkered flag is displayed it means race is finished." After the winner "receives" the flag signal, "the balance of the field receives the checkered flag in the same lap. Finishing positions will be paid off according to most laps traveled in the least time ...."

2. The question was whether all 100 laps of the Shangri-La race were being run under a proce-dure which required the drivers to "revert back" to the positions they held at the completion of the last full lap run under the green flag. It is undisputed that at the completion of the last green lap, Evans was in the lead. Thus, if a "reversion back" rule were in effect, the realigning would have been proper even if Stevens had passed Evans before the yellow flag dropped.

such an appeal was impossible, since that office had been vacant since 1970.[3]

### 2. Stafford Springs

On September 3, 1973, about 10 weeks after the Shangri-La race, plaintiffs participated in a 200-lap, NASCAR-sanctioned race at Stafford Springs Motor Speedway in Stafford Springs, Connecticut. Stevens, again driving for Koszela, led for most of the race and took the checkered flag first, with the second place driver, Leo Cleary, receiving the flag fourteen seconds later. The public address system announced that Stevens had won, and he was awarded the trophy. Shortly thereafter, however, Leo Cleary orally complained that his individual scorer, Blanche Herthe, had not given him credit for a lap that he had completed while making a pit stop. Bob Sall, the NASCAR Chief Track Scorer, agreed, ruling that since Cleary had actually completed the 200 laps before Stevens, Cleary was the official winner.[4]

Immediately after this decision, the plaintiffs delivered a written "protest" and a $100 "protest fee" to Fran Grote, the Chief Steward at Stafford Springs. Grote upheld the official determination of Sall, but referred the "protest" and fee, together with the difference between first and second places, to Competition Director Lin Ku-

chler. Kuchler referred the matter to Joe Epton, NASCAR's Chief Timer and Scorer, who, after rechecking the score sheets, pit stop reports, and race track tape recordings, reported that Leo Cleary had in fact won the race. Kuchler promptly notified Koszela that his protest had not been sustained because Epton had determined that Cleary was indeed the winner. Kuchler relied on section 7, rule 9 of the 1973 NASCAR rule book, which states, "Decisions of NASCAR race officials on interpretation of rules pertaining to race procedure or scoring of positions shall be considered final."

Once again, Koszela appealed to the Commission. In a hearing held the same day as the Shangri-La appeal, the Commission struggled to reconcile the conflicting stories of what transpired at Stafford Springs. Koszela and his wife, both of whom were present at the race, testified that Cleary's loss of time resulted from his having been caught behind the caution car for an entire lap and from having had an unusually slow pit stop. Epton, whose testimony was unsworn,[5] relied on the pit stop report for Cleary, which—if accurate—demonstrated that one of Cleary's laps probably had been left out. Ultimately, the Commission affirmed Epton's decision, relying on the finality rule cited by Kuchler.[6] As in the

---

**3.** Mendel Rivers, the previous National Commissioner, died in 1970. At the time the plaintiffs sought review, a replacement had not been found. The following year, NASCAR appointed an "Acting National Commissioner" to fill the vacancy.

**4.** The error occurred because Cleary's scorer did not know how to score a lap when a car entered the pits. At Stafford Springs, the pit road ran inside the track, parallel to the "home stretch" on which the start-finish line is located. Cleary's pit crew was located just before an imaginary extension of the start-finish line. When Cleary entered the pits on lap 122, he did not cross the start-finish line and his scorer correctly did not enter a lap completion time. However, Ms. Herthe incorrectly failed to enter a completion time when Cleary crossed the line on his way *out* of the pits. Instead, she left box 122 blank. Around 20 laps later, she inserted a time of 011 (shorthand for 1011 seconds), computed by subtracting Cleary's average lap time of 22 seconds from the lap completion time entered in box 123 (033). Upon examining the

score sheets, Chief Scorer Sall found that box 121 read 908 and believed that 103 seconds could not have elapsed between laps 121 and 122. Concluding that the individual scorer must have missed a lap, he inserted an extra box with the time of 980 between boxes 121 and 122. The new box became box 122, old box 122 became box 123, and so forth. Thus, the time entered in Cleary's box 199—682—became his lap completion time for the 200th lap, 8 seconds faster than Stevens' time of 690. Accordingly, Cleary was declared the winner.

**5.** NASCAR rules require testimony before the Commission to be under oath. It appears that the failure to swear in Epton, who was called into the room after the hearing had begun, was an oversight.

**6.** The plaintiffs argue that this finding by the district court was unjustified, since the Racing Commission's written decision cited "rule 9, section 6," a totally inapplicable rule. We disagree. At the Commission hearing, the chair-

case of the Shangri-La dispute, a final appeal was impossible because of the vacancy in the position of National Commissioner.

## C. The Litigation

The plaintiffs brought this action in January 1974, alleging that NASCAR had breached its membership contract by failing to adhere to its own rules. Specifically, the plaintiffs claimed that NASCAR misapplied its rules in determining the rightful winner of the races in question; that its decisions regarding the two victories were arbitrary and clearly erroneous; that the plaintiffs were entitled to a hearing before Competition Director Kuchler; that the appeal procedures before the Racing Commission were inherently unfair; and that the absence of a National Commissioner thwarted their right to a final, impartial appeal. The plaintiffs sought $25,000 in compensatory damages, including damages for loss of the winners' share of the prize money; $250,000 in punitive damages; costs and attorneys' fees; and a declaration that Stevens won the two races in question. In ruling on a preliminary motion to dismiss, the court concluded that regardless of the outcome on the merits, it would not declare Stevens the winner, since such a ruling would unfairly prejudice the rights of the two unjoined, first-place winners, and that it would not award compensatory damages representing the winner's share, since such a remedy might well result in NASCAR's having to pay two first-place purses for each race.[7]

After extensive discovery by both sides, NASCAR brought the instant summary judgment motion in October 1978, contending that there was no genuine issue of material fact. NASCAR argued that courts should not interfere in the internal workings of private associations and that,

in any event, the 1973 NASCAR rules did not confer upon the plaintiffs a right to "protest" the official decisions here involved, much less a right to appear before the Competition Director or to appeal to the Racing Commission. NASCAR maintained that the appeal before the Racing Commission was provided as a matter of grace and that the procedures there employed complied with the applicable NASCAR rules and were fair. Finally, the association contended that the absence of the National Commissioner did not prejudice the plaintiffs because their appeal to that office was untimely.

In passing on NASCAR's motion, the district court found that the law of voluntary associations did not apply to NASCAR. While recognizing that courts generally do not interfere with the internal affairs of private associations, the district court concluded that a strict policy of judicial nonintervention was not justified in a case involving a for-profit organization such as NASCAR which maintains a "stranglehold" on a particular occupation and which does not afford its "members" any right of control or governance. Judge Blumenfeld pointed out, however, that this conclusion did not "leave the court free to roam at will either through NASCAR's rulebook or the proceedings prior to this lawsuit, invalidating those regulations or findings of fact with which it might disagree." As to the merits of the challenged decisions, the court found that both disputes involved "scoring of positions" and thus were final and nonreviewable under section 7, rule 9 of the 1973 NASCAR rules. Under this approach, the complex facts concerning what actually occurred at the racetracks were not material and hence were no bar to summary judgment. As to the challenged NASCAR pro-

man specifically referred to section 7, rule 9, as did Lin Kuchler in his letter to Koszela. We feel that the district court was fully justified in concluding that the Commission intended to refer to section 7, rule 9.

7. NASCAR had moved to dismiss the amended complaint for lack of jurisdictional amount, failure to join two indispensable parties (the two first-place finishers), and failure to exhaust

administrative remedies. Although the complaint survived the motion to dismiss, the court restricted the available relief to satisfy the requirements of Fed.R.Civ.P. 19. *See Koszela v. National Association for Stock Car Auto Racing, Inc.,* Civ. No. H–74–155 (D.Conn. Mar. 6, 1975). This ruling has not been challenged in this appeal.

cedures, the court stated that they were entitled to less judicial deference, but nevertheless found that the "plaintiffs received all the procedural protections to which they were reasonably entitled." Having determined that the merits of the official decisions were not reviewable and that NASCAR's procedures were not inconsistent with the plaintiffs' membership contract with that organization, the court concluded that there were no material issues of fact to be resolved and granted summary judgment in favor of NASCAR. The plaintiffs appeal.

## DISCUSSION

The plaintiffs attack the decision below on several grounds. First, they argue that while the district court was correct in determining that it could review the NASCAR proceedings, it erred in concluding that the merits of the official decisions were not reviewable. Instead, they argue that the district court was free to scrutinize the official decisions here involved and insist that any reasonable interpretation of the NASCAR rules conclusively demonstrates that the realigning at Shangri-La and the lap insertion at Stafford Springs were unauthorized and improper. Second, they claim that NASCAR failed to obey its procedural rules by entertaining the oral protests of Evans at Shangri-La and Cleary at Stafford Springs. Third, appellants contend that the procedures of the Competition Director and the Racing Commission violated the 1973 rules and amounted to a material breach of their membership contract. Finally, they claim that the absence of a National Commissioner deprived them of the final appeal to which they were entitled under the rules.

■ At the outset, we agree with the district court that the principle of judicial noninterference set forth in the law of voluntary associations, *see, e. g., STP Corpora-*

tion v. United States Auto Club, 286 F.Supp. 146, 150–51 (S.D.Ind.1968), is not strictly applicable to the instant case. As the district court found, the policies supporting noninterference are considerably weaker where the organization is "primarily a business run for profit," in which the " 'members' have no rights whatsoever with respect to the internal governance of the organization." Moreover, NASCAR's complete dominance in the field of stock car racing leaves competitors little choice but to join. Where an organization has achieved such a "stranglehold," rigid adherence to a "hands off" policy is inappropriate. *See* Chafee, *The Internal Affairs of Associations Not for Profit*, 43 Harv.L.Rev. 993, 1021–23 (1930); *Developments in the Law—Judicial Control of Actions of Private Associations*, 76 Harv.L.Rev. 983, 993–94 (1963).

■ From this, however, it does not follow, as plaintiffs contend, that a reviewing court is free to reexamine the correctness of the official track decisions in question. The 1973 rules, which set forth the rights and obligations of the plaintiffs' membership contract with NASCAR during the relevant period, *see Riko Enterprises Inc. v. Seattle Supersonics Corp.*, 357 F.Supp. 521 (S.D.N.Y.1973), do not provide for any administrative appeal, much less judicial review, of official decisions. Rather, section 7, rule 9 clearly provides that "[d]ecisions of NASCAR race officials on interpretation of rules pertaining to race procedure or scoring of positions shall be considered final," subject only to a recheck of score sheets. The district court concluded that since both of the contested decisions involved the "scoring of positions," they should be accorded finality under the NASCAR rules.[8]

The Commission found that Jerry Bowen, the official NASCAR starter at Shangri-La, had realigned the cars. The plaintiffs maintain, however, that Fran Gitchell, the track promoter and not a NASCAR official,

---

**8.** The decision to realign the cars at Shangri-La could also be characterized as an "interpretation of rules pertaining to race procedure," since both the local "reversion back" rule and the "yellow flag" rule involve race procedure.

This apparently is the position taken by the 1974 NASCAR rules. *See* note 12, *infra*. The distinction is not crucial, however, since the finality rule covers both situations.

was responsible for that action. Plaintiffs insist that this issue of fact is material because section 7, rule 9 applies only to "[d]ecisions of NASCAR officials." Further, they argue that even if Bowen realigned the cars, there must be a determination that "it is within the official purview of the starter to re-arrange cars in the situation at Shangri-La." We disagree. The rules on their face do not provide for such jurisdictional challenges to official decisions. The only provision granting a competitor the right to challenge occurrences at the track is the protest mechanism, which applies to "any *violation* of [the NASCAR] rules, specifications or entry blank terms." As we point out later, this provision is not intended to be a device by which disappointed competitors may challenge an official's interpretation of the rules or application of the rules to the facts. To allow competitors to challenge the authority of various track officials—NASCAR or non-NASCAR— would result in precisely the sort of protracted disputes that the finality rule is supposed to prevent. The resultant delays would interfere with computation of the racers' "point standings," which serve as the basis for determining local, state and national championships.[9] Further, under the plaintiffs' approach, competitors would have to decide whether to obey a given official's decision, since obedience to an unauthorized official would not be protected. Besides the obvious danger that such decisionmaking would present, this would be an especially difficult task for the drivers, since the record shows that the distinction between NASCAR and non-NASCAR track officials is not all that discernible to the competitors or the officials themselves, particularly at a new NASCAR track like Shangri-La.[10] Moreover, reviewing NASCAR officials would be forced to decide races not on the basis of the "checkered flag rule," but on the basis of after-the-fact speculation as to who would have won the race but for the unauthorized official decision. In cases where the contested decision was made at the beginning or in the middle of the race, such speculation would be fraught with imprecision. The plaintiffs' contract with NASCAR does not contemplate such second-guessing as to the jurisdiction of the official who made the contested decision. We agree with the district court's conclusion that such an issue of fact is not material:

> What the decision was and how it was reached are subordinate to the question of whether a decision was made. It is undisputed that a track official directed Richie Evans to pull ahead of Bugs Stevens during the Shangri-La race. Thus,

> MR. KELLER: Who was the NASCAR official making the decision?
> MRS. KOSZELA: Now, have you ever been to a race track where you have heard a NASCAR official get up and take a mike and post the position? Tell me the truth. No. You rely on the announcer.
> MR. KOSZELA: And he is told by the scorer.
> MRS. KOSZELA: You have never heard an official get up and say Bugs Stevens or Leo Cleary or Ray Hendricks is the official winner.
> MR. KELLER: I would say this ... if I had something to do with it, I'd go up in the tower and stand by the announcer while he was making the announcement.
> MRS. KOSZELA: Bob Sall was right there .... They were touching.

J. App. 234-35. The record shows that the NASCAR officials at Shangri-La were not employees of NASCAR. They were selected and paid for by Fran Gitchell, in his capacity as race promoter.

---

9. The present litigation presents a good example of the delay which can result from judicial involvement. The plaintiffs filed their original complaint on January 8, 1974. This complaint was dismissed for failure to join Stevens, an indispensable party. The amended complaint was filed May 14; NASCAR again moved to dismiss. *See* note 7, *supra*. The district court denied this motion nearly a year later, at which point discovery began. After nearly three years of discovery, the instant motion for summary judgment was brought on October 12, 1978. A flurry of affidavits and exhibits ensued. Finally, on January 10, 1980, the district court rendered its decision, which was appealed to this Court and argued on October 17, 1980. By the time this decision is filed, this lawsuit will have consumed more than eight years.

10. The following exchange between Racing Commission Chairman Keller and Mr. and Mrs. Koszela illustrates the interdependence of NASCAR and non-NASCAR track officials:

... the fact remains that an official decision *was* made. The making of the decision (regardless of by which official or on what ground) found ample support in the record [and] the decision was final ....

Ultimately, the solution for unauthorized or improper officiating lies not in individual challenges seeking to undo what has been done, but rather in pressure brought upon the officials in charge by drivers, owners, fans, and even NASCAR to improve the caliber of race supervision.

As to the Stafford Springs dispute, the finality principle is likewise controlling. The decision of Bob Sall, the NASCAR Chief Timer and Scorer at the track, clearly involved the "scoring of positions" and was therefore "final" under section 7, rule 9. After that decision, the plaintiffs' only remedy was a scoring recheck. And while it may be true, as plaintiffs argue, that the track officials considered the Stafford Springs complaint to be a "protest," it is nevertheless clear that NASCAR treated the dispute as a request for a scoring recheck, since the proper person to hear protests, Competition Director Kuchler, referred the controversy to the proper person to decide rechecks, Chief Timer and Scorer Epton. Thus, Bob Sall's decision to insert a lap was final, subject only to a recheck; when the recheck confirmed Sall's decision, the plaintiffs' remedies were exhausted and NASCAR had satisfied its contractual obligations. Summary judgment was therefore appropriate on this point.

The plaintiffs next argue that even if this Court cannot review the merits of the disputed races, NASCAR unevenly applied its procedures in reaching its decisions. The core of the problem, according to the plaintiffs, is that NASCAR failed to adhere to its own protest procedures, which require a written statement together with a $100 fee. They argue that when Keck and the competitors agreed at Shangri-La that Stevens was the winner, a final official decision had been reached and Evans' subsequent complaint should have complied with the strictures of the protest rule. Similarly, they claim, the final decision at Stafford Springs was the announcement that Stevens had won the event. At that point, they contend, it was incumbent upon Cleary to satisfy the formal requirements of the protest rule. Thus, they conclude, the failure of NASCAR officials to follow the protest rule cost them their first-place victories in both races.

■ Essentially, the plaintiffs seek to turn the finality rule upon the officials themselves by arguing that an official may not reconsider his decision—either on his own initiative or at the bidding of a competitor—without compliance with the formal protest procedures. The difficulty with this argument is that the protest rule is not a vehicle for challenging official decisions concerning "scoring of positions" or "race procedures." Instead, the protest provision set forth in section 15, rule 4 states simply that "[a]ny affected member may, as a matter of right, protest any violation of these rules, specifications or entry blank terms to the Competition Director ...." Section 14 of the rules, which lists various sorts of "violations," refers to actions of drivers, pit crews and other "affected members" of NASCAR, not to decisions of track officials.[11] Read this way, the protest provision is a logical corollary to the finality provision of section 7, rule 9; an interpretation of the protest provision that would allow challenges to official decisions would effectively

---

11. Violation of NASCAR rules subjects the offender to disciplinary action, including disqualification, suspension, fine, or loss of "points." Examples of violations include fighting in the pits, drinking at the racetrack, assaulting or threatening a NASCAR official, allowing an unlicensed person to drive in a race, transferring a license, or using illegal equipment. Throughout the section, "members" and "NAS-CAR officials" are referred to separately. The only rule in section 14 that imposes a duty on officials is rule 3(*1*), which states that *NASCAR may revoke its sanction from any promoter or track operator who fails to fulfill his agreement with NASCAR*; nothing in this rule suggests that a competitor would have standing to bring a protest for "violation" of this rule.

nullify the sensible purposes of the finality rule.[12]

Much of the difficulty with this case has surrounded the imprecision with which competitors and NASCAR officials use the term "protest." For example, Fran Grote, the Chief Steward at Stafford Springs, stated in a letter to NASCAR headquarters that he was forwarding Koszela's "protest" of Bob Sall's decision, notwithstanding that the rules provide only for a recheck. Competition Director Kuchler informed Koszela that his Stafford Springs "protest" had been denied, even though Kuchler had referred the dispute to and relied on the decision of Joe Epton, the person responsible for conducting rechecks. Similarly, at Shangri-La there was no "violation of [the] rules, specifications or entry blank terms" to "protest"; indeed, there was not even a final decision that night. Instead, Chief Steward Keck "referred" the dispute to NASCAR, and an official decision was not reached until Kuchler's decision 8 days later.[13] Thus, even if we were to assume that the rules permitted a competitor to protest

an official decision, the circumstances at Shangri-La reveal that there was no track decision to protest. Furthermore, the dispute before Kuchler could not have been a protest, since it was submitted to him by Keck, the Chief Steward, and not by an "affected member," as required by the protest rule. We conclude that although the parties may have been confused about the applicability of the protest rule, the plaintiffs were not deprived of any procedural protection to which they would have been entitled under a proper application of that rule.

The plaintiffs' argument that they were entitled to a hearing before the Competition Director finds no support in the NASCAR rules. The rules provide for a hearing before the Competition Director only for those affected members "against whom disciplinary action has been instituted." Neither of the present disputes falls within this category, even if the referral and recheck here involved were to be considered as "protests" under the rules. Moreover, it appears that the Racing Commission did not

---

**12.** The 1974 NASCAR rules clarified this ambiguity by specifically linking the finality rule and the protest rule:

1. Decisions of NASCAR officials assigned to an event with respect to the interpretation of the NASCAR Rules, as they may pertain to race procedure, *shall be final and there shall be no appeal or protest thereof.* Such interpretations . . . include, but are not necessarily limited to, the line up of the cars, the start of the race, the control of the cars, the election to stop or delay a race, the positioning of cars on re-starts, and the assessment of lap and time penalties.

2. The NASCAR official designated by NASCAR to be the Official Scorer for an event shall be responsible for timing and scoring the event. The decisions of the Official Scorer, with respect to timing and scoring, *shall be final except when the Official Scorer elects to request a re-check . . . or when the Official Scorer is asked by a driver who has competed in the event to submit a request for such a re-check . . . .*

1974 NASCAR Rules, § 11, rules 1 & 2 (emphasis added).

**13.** The plaintiffs argue that such a referral procedure is unauthorized by the rules and amounts to a material breach of their contract. At the very least, they argue, the permissibility of the referral procedure presents a material

issue of fact. But the record reveals, as the district court found, that the referral procedure is common, particularly among new NASCAR tracks. For example, the affidavit of Lin Kuchler states that "[q]uestions of proper race procedure are from time to time referred to NASCAR headquarters for an interpretation and ruling . . . ." Pete Keller, who was chairman of the Racing Commission during the hearings, reassured Chief Steward Keck that failure to reach a final decision at the track "was not unusual," J.App. 93, and later explained to plaintiffs' counsel that the Shangri-La dispute "came in blank, because the race officials and promoters could not make a decision as to who was first and second, so it was sent to us for us to make a decision." J. App. 143–44. Russ Moyer, another Commission member, implicitly acknowledged the permissibility of the referral procedure when he informed plaintiffs' attorney that "there actually was no 'final decision' on the night of the race" and that "it was only necessary for Mr. Kuchler to consider the facts as presented by the chief steward of the event." J. App. 63. We feel that the district court was fully justified in concluding that the referral procedure was common practice at NASCAR, and was not inconsistent with the rules or the plaintiffs' membership contract.

restrict the scope of its inquiry to a limited review of the determination of the Competition Director, but instead essentially conducted a *de novo* hearing.[14] Therefore, even if the rules could be construed to provide a right to a hearing before the Competition Director, the plaintiffs were not seriously prejudiced, since the Racing Commission, which granted review as a matter of grace, engaged in extensive, independent fact finding.

The plaintiffs also argue that the procedures employed by the Racing Commission were so inherently unfair as to amount to a material breach of their membership contract with NASCAR. However, the NASCAR rules specifically provide in section 16, rule 1 that "[i]n conducting a hearing the Commission shall not be bound by technical or formal rules of procedure except as provided herein, but shall conduct hearings in such manner as to best ascertain the rights of all parties to the proceedings under these rules." We agree with the district court that the Commission's action in excluding the plaintiffs during Keck's testimony and in forbidding cross-examination was not inconsistent with its procedural rules and did not deprive the plaintiffs of a fair hearing. We also agree with the district court that the unsworn testimony of Jerry Bowen and Joe Epton, although prohibited by NASCAR's rules, did not prejudice the plaintiffs and was immaterial for the purposes of summary judgment. As Judge Blumenfeld found, the Racing Commission's decision concerning Stafford Springs was based on section 7, rule 9 and not on the unsworn testimony of Epton. Similarly, although there can be no doubt that the Commission relied on the telephone conference with Jerry Bowen, the plaintiffs suffered no prejudice from this procedural lapse. The fact remained that an official decision to realign the cars had been made, regardless of which official made the decision or on what grounds it was made, and that such a decision was entitled to finality under the rules. Thus, whether the basis for the realigning, as articulated by Bowen, was the "yellow flag rule" or a local track rule requiring "reversion back" to the last lap run under green, the decision was final and the plaintiffs were not entitled to have it overturned.

Finally, the plaintiffs argue that the absence of a National Commissioner constituted a material breach of their contract. Relying on section 16A, which states that "any affected member may as a matter of right appeal any decision of the National Stock Car Racing Commission" to the National Commissioner, the plaintiffs contend that the vacancy in that office "frustrated and denied" their right of final appeal. Section 16A makes the National Commissioner the "final appellate authority with regard to a violation of these rules, specifications, entry blank terms, or disciplinary procedures." In short, the Commissioner is the final arbiter of protests, which these disputes are not. Indeed, had this case involved protests, the plaintiffs would have been entitled as a matter of right to an appeal before the Racing Commission and final review by the Commissioner. Were this such a case, their argument might have some force. But in this case, the plaintiffs were not entitled to an appeal before the Racing Commission. Under these circumstances, we do not feel that the inability of NASCAR to provide yet another tier of review to a dispute that was not entitled to review

14. The Commission apparently did not feel bound in any way to the findings or conclusions of Kuchler. For example, Mr. Keller told Chief Steward Keck, "This meeting here has nothing to do with the decision that Lin Kuchler made .... That decision has been appealed, so what we come to today will be the decision of the appeal, and we want you to feel free to tell us exactly in your own words when we're wrong and when we're right ...." J. App. 89. Later, Mr. Keller told plaintiffs' attorney, "[T]he actual truth and the stuff that comes out today in this meeting is what we will actually abide by and what we will take into consideration as the final outcome of this Commission hearing," J. App. 118, and later, "The decision that was made makes no difference to us. It has no bearing on us at all." J. App. 211. Finally, NASCAR's attorney admonished the Commission members, "[I]f you have not heard from enough people in order to reach a decision that you think is fair, then I think it's your obligation to get other people down here to give you the full story." J. App. 145.

in the first instance can be characterized as a material breach of its contract with the plaintiffs.

Affirmed.