Robert A. CROUCH and Glen A.
Wright, Plaintiffs-Appellees,

v.

NATIONAL ASSOCIATION FOR STOCK
CAR AUTO RACING, INC., and Randy
LaJoie, Defendants-Appellants.

Nos. 572, 575, Docket 87-7755, 87-7757.

United States Court of Appeals,
Second Circuit.

Argued Jan. 27, 1988.

Decided April 20, 1988.

James E. Rocap, III, Washington, D.C.
(Miller, Cassidy, Larroca & Lewin, Washington, D.C., Robert B. Hemley, Gravel & Shea, Burlington, Vt., of counsel), for defendant-appellant NASCAR.

David Rath, Kohn & Rath, Hinesburg, Vt., on the brief, for defendant-appellant LaJoie.

Robert R. McKearin, Burlington, Vt. (Dinse, Erdmann & Clapp, Burlington, Vt., of counsel), for plaintiffs-appellees.

Before FEINBERG, Chief Judge, and MESKILL and MAHONEY, Circuit Judges.

MESKILL, Circuit Judge:

The dispute in this case arises out of an August 1985 stock car race in Vermont that was sanctioned by the defendant-appellant National Association for Stock Car Auto Racing, Inc. (NASCAR). Plaintiff-appellee Robert Crouch, driving a car owned by plaintiff-appellee Glen Wright, was originally awarded first place in the race, but that decision was overturned on review by national NASCAR officials, who declared defendant-appellant Randy LaJoie the winner of the race. The plaintiffs then brought this diversity suit[1] against NASCAR alleging that the national NASCAR officials had no authority to overturn the local track officials' decision that Crouch had won the race. The United States District Court for the District of Vermont, Coffrin, C.J., denied both parties' first motions for summary judgment. The court later granted plaintiffs' second motion for summary judgment, however, concluding that in light of a NASCAR rule that accord-

---

1. This action was originally commenced in state court and later was removed to federal court; there is complete diversity of citizenship and the amount of prize money at issue exceeds $10,000, see J.App. at 78. There is no dispute among the parties as to the proper choice of law.

ed finality over race procedure decisions to local officials, national NASCAR officials acted unreasonably by overruling race procedure decisions made by the local track officials and declaring LaJoie the winner of the race.

We conclude that the district court did not apply the correct standard for judicial review of NASCAR's decisions. In addition, we hold that under the correct standard, the district court erred in granting the plaintiffs' motion for summary judgment, rather than entering judgment in favor of the defendants.

## BACKGROUND

NASCAR is a for-profit corporation that is dedicated to the promotion of stock car racing. This case arises out of a 100 lap NASCAR-sanctioned stock car race that took place at Catamount Speedway in Vermont on August 11, 1985. Two incidents took place during the course of this race that gave rise to the controversy between the parties. The first incident occurred at the beginning of the race, when there was a restart because of an accident involving the LaJoie car. During this restart, the LaJoie car remained in the pit area behind the start/finish line. As the other cars on the track approached the start/finish line at the beginning of the second lap, the LaJoie car crossed the start/finish line in the pit area and then entered the track with the rest of the cars. Gordon Nielsen, the official scorer of the race, ruled that LaJoie could not receive credit for laps completed until he had first crossed the start/finish line on the track, rather than in the pits. LaJoie contends that Nielsen's decision was wrong because it was contrary to NASCAR scoring procedures used throughout the rest of the country, and that his car was scored throughout the race with one lap less than it would otherwise have been given because of Nielsen's erroneous ruling.

The second incident occurred during laps 68–71. During lap 68, a yellow caution flag was displayed to the drivers because of another accident. Under Rule 12–4(a) of NASCAR's rulebook, "[a]fter cars receive [the] yellow flag at the start and finish line, all cars must hold [their] position until either the green flag is again displayed, or the red flag which would automatically stop the race [is displayed]." According to Thomas Curley, the local NASCAR track official, LaJoie improperly passed several cars after the yellow flag was displayed, in violation of Rule 12–4(a). LaJoie contends that if the local officials had made the correct decision with respect to the first incident, then he would have been positioned on the lap 68 restart ahead of the vehicles that he passed under the yellow flag. He thus believed that he had a right to pass the cars because of Nielsen's scoring error during laps 1 and 2.

There is a dispute between the parties as to what happened next. Curley asserts that a black flag was displayed to the LaJoie car for four consecutive laps, although Bob Johnson, LaJoie's crew chief, maintains that he saw the black flag only once. Under Rule 12–6 of the rulebook, a driver is to report to the NASCAR official at the pit immediately after a black flag is displayed to him or her. Rule 12–6 also provides that after a car has been black-flagged for three consecutive laps, "scoring on [the] car involved will be discontinued until [a] pit stop has been made and [the] car is released by a NASCAR official to resume racing." Curley maintains that after the LaJoie car failed to obey the black flag on the third lap, he told Nielsen to stop scoring the LaJoie car and informed Johnson either directly or indirectly that scoring had been stopped on the LaJoie car. Johnson and LaJoie deny that they were ever told that their car had been disqualified or that scoring on their car had been stopped. No black flag with a white cross was displayed to LaJoie, although Rule 12–6 provides that such a flag is to be displayed to inform a driver that scoring of his or her car has been discontinued. Despite Curley's instruction to Nielsen to stop scoring the LaJoie car as of lap 71, Nielsen continued to record the LaJoie car on the scoring tapes.

It is undisputed that LaJoie finished the 100 laps of the race before any of the other

competitors. There is some controversy concerning whether Curley announced that Crouch had won the race, however; Curley contends that he did announce that Crouch had won the race, while LaJoie and Johnson maintain that no final decision was announced by Curley.

LaJoie requested a scoring check pursuant to Rule 11–2 of the rulebook, and Curley sent the scoring tapes and a transfer memorandum to the national office of NASCAR. The memorandum asked for NASCAR's immediate review of the initial lap penalty imposed on LaJoie, and stated that in Curley's opinion, "the issue to be dealt with in this instance is not necessarily a scoring decision, but rather a race procedure decision." J.App. at 53. Nielsen also submitted a lengthy memorandum to NASCAR headquarters describing his scoring of the race at issue, including his scoring of the LaJoie car after the lap 68 incident. *See id.* at 68–72.

The national NASCAR officials then reviewed the materials concerning the race. As one official noted in his affidavit, the referral from Curley was "the kind of request which we are frequently asked and routinely answer as part of the administration of NASCAR sponsored events." J. App. at 46. Based upon the materials presented, NASCAR decided that upon correction of the scoring errors that had been made, LaJoie should be declared the winner of the race. In addition, NASCAR officials concluded that LaJoie had violated the black flag rule, and that a penalty should be imposed for this violation. They thus issued a penalty notice to LaJoie pursuant to Rule 13–2 and fined him $1,200.

Plaintiffs then brought this action in court alleging that the lap 1–2 decision and the lap 68–71 alleged disqualification dealt with "race procedure" decisions of local NASCAR officials that could not be reviewed by NASCAR headquarters under Section 11 of the rulebook. Rule 11–1 provides that "[d]ecisions of NASCAR officials assigned to an event with respect to the interpretation of the NASCAR Rules, as they may pertain to race procedure, shall be final and there shall be no appeal or

protest thereof." Under this rule, race procedure decisions "include, but are not necessarily limited to, the line up of the cars, the start of the race, the control of the cars, the election to stop or delay a race, the positioning of cars on re-starts, and the assessment of lap and time penalties." NASCAR moved to dismiss or for summary judgment on the ground that its official decisions are not subject to judicial review. NASCAR contended that its decisions were not reviewable under Rule 9–2, which provides that "[b]y submitting his entry application and/or taking part in any activity relating to the event, a competitor agrees to abide by the decisions of those officials relating to the event, and agrees that such decisions are non-appealable and non-[litigable] except as provided in Section 13 and 14 of this Rulebook [which provide for an internal review and appeal process]."

In the first of its three opinions in this case, which was dated December 1, 1986, the district court asserted that "[t]he crux of the case at bar is whether the defendant association abided by its own procedures for resolving disputed track decisions." J.App. at 100. It also noted that while courts are generally reluctant to interfere with the internal proceedings of private associations, courts may intervene when an association enforces its rules in a manner that is "unreasonable or arbitrary." *Id.* It thus limited its review to the issue of whether NASCAR acted unreasonably or arbitrarily in applying its finality rules when it overturned the local track officials' decision and named LaJoie the winner of the race. *Id.* at 101.

After reviewing the NASCAR rules, the court concluded that the lap 1–2 incident involved either a "scoring" or a "race procedure" decision. It thus reasoned that because NASCAR could reasonably have concluded that it was reversing a scoring decision, which is reviewable by the national office, NASCAR did not act unreasonably with respect to the first incident. As to the second incident, however, the court surmised that Curley had disqualified LaJoie, and that disqualification was a non-reviewable "race procedure" decision under

the NASCAR rules. The court concluded that the national NASCAR headquarters acted unreasonably if it was aware that it was overruling a disqualification decision by the local officials by declaring LaJoie the winner of the race during its scoring recheck. Because the court found that there were factual issues concerning "whether the national NASCAR headquarters was aware during its recheck that the local race officials had assessed LaJoie with lap penalties or disqualification," J.App. at 113, the court denied both parties' motions for summary judgment.

In its second opinion, dated January 30, 1987, the district court noted that in its first opinion, it had misinterpreted Rule 13-5 of NASCAR's rulebook when it was deciding whether disqualification was a race procedure decision. Rule 13-5 provides in part that "[p]enalties for violation of NASCAR Rules are determined by the gravity of the violation.... Such penalties may include disqualification, suspension, fines and/or loss of points...." The court concluded that when viewing Rule 13-5 as a whole, the penalties described thereunder related to the penalties to be imposed by the NASCAR headquarters, and thus Rule 13-5 does not support the conclusion that the assessment of disqualification by local track officials was a race procedure decision. The court added, however, that in its view disqualification is a penalty that may be imposed by either the national NASCAR officials or by the local NASCAR officials, as an emergency action or as a lap and time penalty. The court then concluded that since under Rule 11-1 the assessment of lap and time penalties constitutes a race procedure decision, it would adhere to its earlier conclusion that Curley's decision to disqualify LaJoie was a nonreviewable race procedure decision. J.App. at 131.

In its third opinion, dated July 30, 1987, the court granted the plaintiffs' motion for summary judgment. The court noted that while it could not conclude "as a matter of law that NASCAR was explicitly informed that a 'disqualification' had taken place, [it did] find that a disqualification took place and that NASCAR knew of facts that established that LaJoie had been disqualified

by the local officials." J.App. at 187–88. The court added that "NASCAR headquarters was well aware that Curley had ordered the scoring stopped on LaJoie's vehicle," id. at 188, and that the local officials' decision to stop scoring LaJoie's car after the black flag incident amounted to either the assessment of a disqualification or of a lap penalty, both of which are race procedure decisions not subject to further review by national NASCAR officials, id. at 191–92. The court accordingly decided that the national NASCAR officials acted unreasonably by overriding race procedure decisions.

On appeal, LaJoie and NASCAR contend that the district court adopted the wrong standard for judicial review of NASCAR's decisions. They argue that if there is to be judicial review at all of competition-related decisions of organizations like NASCAR, it should be limited to instances in which the organization's officials acted in bad faith. Alternatively, they maintain that the district court misconstrued material provisions of the rulebook when it concluded that the national NASCAR officials had improperly reversed a race procedure decision.

## DISCUSSION

■ The threshold issue that we must resolve is the proper standard for judicial review of NASCAR's interpretation of its own rules. Our decision in *Koszela v. National Association of Stock Car Auto Racing, Inc.*, 646 F.2d 749 (2d Cir.1981), provides some guidance. In that case, we considered claims that NASCAR misapplied its rules in determining the rightful winner of two races and that its decisions regarding the two races were arbitrary and clearly erroneous. We first reasoned that the principle of judicial noninterference set forth in the law of voluntary associations was not strictly applicable, noting that NASCAR was a for-profit company that completely dominated the field of stock car racing and that its members have no rights whatsoever with respect to the internal governance of the organization. *Id.* at 754. We added, however, that a reviewing court is not free to reexamine the correctness of

the official track decisions in question because NASCAR's rules "do not provide for any administrative appeal, much less judicial review, of official decisions." *Id.* We also noted that the only provision granting a competitor the right to challenge occurrences at the track is the protest mechanism, and that "this provision is not intended to be a device by which disappointed competitors may challenge an official's interpretation of the rules or the application of the rules to the facts." *Id.* at 755. We accordingly refused to reexamine the correctness of the official track decisions in question.

In the instant case, the district court cited *Koszela*, and concluded that because of the considerations discussed in that case it was "precluded from reviewing the official decisions of NASCAR officials with respect to the Catamount race." J.App. at 98. It added that "[t]o allow competitors to challenge the assessment of lap and time penalties or the timing and scoring of laps would result in the same type of protracted disputes that the finality rule is meant to prevent.... By according final weight to the official NASCAR track decisions, this court avoids placing itself in the position of 'super-referee.'" *Id.* at 99.

The court also concluded, however, that the considerations that preclude review of the correctness of the official track decisions do not necessarily prevent the review of the procedures used to implement these decisions. The court added that "[w]hile courts may be hesitant to unnecessarily interject themselves into the private affairs of an association, where the association enforces its rules in a manner that is unreasonable or arbitrary courts may intervene." J.App. at 100. In applying this standard, the court did not defer to NASCAR's judgment that under its rules, the disputed actions of the local track officials did not constitute the imposition of a lap or time penalty, or to NASCAR's decision that disqualification is not a race procedure decision. Rather, the court apparently believed that under its adopted standard, it was appropriate to undertake a *de novo* review of the NASCAR rules in order to determine whether the national NASCAR officials had acted unreasonably or arbitrarily by reviewing the local track officials' decisions.

Both sides dispute the validity of the standard for judicial review set forth by the district court. NASCAR and LaJoie argue that there should be a higher standard of review for competition-related decisions so that the results of sports contests will not constantly be at risk of being placed in "judicial limbo." They suggest that if there is to be intervention at all, it should be "limited to egregious cases where the officiating authority acted in bad faith, with actual malice toward the affected competitor." NASCAR's Brief at 32. Conversely, Crouch and Wright contend that the district court erred in requiring them to establish that NASCAR's actions were arbitrary or unreasonable; they maintain that courts should intervene in any instance in which NASCAR has breached the membership contract by not following its own rules.

While we agree with the district court that there is a distinction between reviewing the decisions made by private organizations and reviewing the procedures used in reaching those decisions, we do not agree with the court's conclusion that it can overrule an organization's interpretation of its own procedural rules whenever the court concludes that the organization's interpretation is "unreasonable" (especially when "unreasonable" is interpreted to mean simply that the court disagrees with the interpretation, as is apparently the case here). It is true that courts have demonstrated more of a willingness to intervene in the internal matters of private associations when they conclude that there are inadequate procedural safeguards to protect members' rights. For example, in *Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646 (5th Cir.1977), the court considered whether it could review the decision of a quarter horse registration association that a colt named Naturally High could not be registered because of its excessive white markings. The court concluded that "the exception to non-intervention was large enough for Naturally High to gallop

through." *Id.* at 656. Specifically, the court concluded that because the registration association had registered other horses that did not have any better pedigree or conformation than Naturally High, the association should have provided the procedural protection of a hearing before it made the subjective determination that Naturally High could not be registered. *Id.* at 656–57. In addition, in *Jackson v. American Yorkshire Club*, 340 F.Supp. 628 (N.D.Iowa 1971), although the court refused to rule on "the ultimate question of whether certain swine in plaintiff's herd are in fact purebred Yorks," noting that it was not "some kind of super Yorkshire board," it did hold that the plaintiff was entitled to a fair hearing before the American Yorkshire Association suspended plaintiff's membership because of allegations that one or more of his hogs were nonpurebreds or crossbreeds. *Id.* at 635.

The court's decision in *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527 (7th Cir.), *cert. den.* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), also is relevant. In that case, the court concluded that a waiver of recourse to the courts that was signed by the major league baseball clubs was valid, noting that such a waiver coincides with the common law standard disallowing court interference. *Id.* at 543. The court added that there are exceptions to this general rule of nonreviewability of the actions of private associations, however, "1) where the rules, regulations or judgments of the association are in contravention to the laws of the land or in disregard of the charter or bylaws of the association and 2) where the association had failed to follow the basic rudiments of due process of law." *Id.* at 544 (footnotes omitted). *See also Koszela*, 646 F.2d at 757 (noting that even though there may have been confusion about the applicability of a particular NASCAR rule, "the plaintiffs were not deprived of any procedural protection to which they would have been entitled under a proper application of that rule"); *McCreery Angus Farms v. American Angus Ass'n*, 379 F.Supp. 1008, 1019 (S.D.Ill.) (noting in a case concerning the registering of purebred Black Aberdeen Angus cattle, that

although the court generally would not "be the bull in the china shop of private associations' internal affairs," the members of the breeding organization were entitled to a fair hearing before they were suspended), *aff'd mem.*, 506 F.2d 1404 (7th Cir.1974).

In the instant case, Crouch and Wright are not claiming that they were deprived of any procedural safeguards or that their due process rights were violated, however. Rather, the crux of their complaint is that NASCAR improperly provided LaJoie with a procedural safeguard, *i.e.*, review of the local track officials' decisions by the NASCAR headquarters. In fact, LaJoie maintains that if the district court correctly held that the local track officials' actions constituted a disqualification, then he was entitled to be informed of the disqualification and to have the disqualification decision reviewed by NASCAR headquarters pursuant to Section 13 of the rulebook. Section 13 provides that all violations of NASCAR rules are to be reported in writing to the NASCAR Vice President for Competition, and that this Vice President can review these reported violations. We therefore do not believe that the cases discussing the occasional need for a court to intervene in the internal affairs of an association because of the lack of adequate safeguards support the district court's decision.

Although here there was no allegation of inadequate procedural protections, the district court still thought that it was appropriate to conduct its own analysis of NASCAR's interpretation of its procedural rules. Moreover, despite the court's recognition that NASCAR possesses considerable stock car racing expertise upon which it may rely in interpreting its own rules, J.App. at 101, the court apparently did not give much weight to that expertise in reaching its decision that NASCAR acted unreasonably by overturning a race procedure decision made by a local track official. Rather, the court evidently felt that in order to determine whether NASCAR acted unreasonably or arbitrarily, it should itself delve into NASCAR's rulebook and decide *de novo* whether the lap 68–71 incident involved a disqualification, and whether a

disqualification constitutes a lap and time penalty and is therefore a nonreviewable race procedure decision.

We believe the district court erred in making this inquiry. As the Seventh Circuit noted when rejecting the argument that the Commissioner of Baseball's actions were "procedurally unfair," certain standards, such as "the best interests of baseball, [and] the interests of the morale of the players and the honor of the game ... are not necessarily familiar to courts and obviously require some expertise in their application." *Finley*, 569 F.2d at 536–37 (footnotes omitted). The court accordingly proclaimed that the judiciary should not be professional baseball's "umpire and governor." *Id.* at 537. We believe that federal courts are equally unfamiliar with standards such as "race procedure decision" and "lap and time penalty," and thus should decline the plaintiffs' invitation to become the "super-scorer" for stock car racing disputes. Furthermore, there is no contention that NASCAR acted "in disregard of [its] charter or bylaws." *Id.* at 544. Rather, plaintiffs-appellees contend essentially that NASCAR misinterpreted its own internal regulations. Accordingly, we conclude that the district court should have deferred to NASCAR's interpretation of its own rules in the absence of an allegation that NASCAR acted in bad faith or in violation of any local, state or federal laws. *See Developments in the Law—Judicial Control of Actions of Private Associations*, 76 Harv.L.Rev. 983, 1025–26 (1963) (pointing out that courts have held that it is appropriate to accede to an association's interpretation of its own procedural rules if the association tribunal was acting in good faith); *see also Finley*, 569 F.2d at 539 (where court, when considering charges that the Commissioner of Baseball had acted in an arbitrary, capricious and unreasonable way, concluded that the Commissioner's decision that certain actions were in the best interests of baseball should stand where he acted in good faith, whether or not the court believed he was right or wrong in making this decision). We believe that adopting any lower standard for reviewing an organization's interpretation of

its own procedural rules would create too great a danger that courts will become mired down in what has been called the "dismal swamp"—the area of a group's activity concerning which only the group can speak competently. *See Developments in the Law, supra*, at 991 (citing Chafee, *The Internal Affairs of Associations Not For Profit*, 43 Harv.L.Rev. 993, 1023–26 (1930)). Indeed, the district court's admitted confusion about the proper interpretation of NASCAR Rule 13–5, *see* J.App. at 129–30, is one illustration of how perilously close the court came to the edge of the swamp under its adopted standard of review. As we acknowledged in *Koszela*, "[u]ltimately, the solution for unauthorized or improper officiating lies not in individual challenges seeking to undo what has been done, but rather in pressure brought upon the officials in charge by drivers, owners, fans, and even NASCAR to improve the caliber of [NASCAR's supervision of races]." 646 F.2d at 756.

■ In this case, there was no allegation that the officials at NASCAR headquarters were acting in bad faith or unlawfully in examining the lap 68–71 incident. The affidavit of James Hunter, NASCAR's Vice President for Administration, states that he believed that local officials were "uncertain whether the issues presented were scoring or race procedure questions, and, accordingly, asked NASCAR to make that determination, among others." J.App. at 46. The affidavit also stated that NASCAR frequently received this type of request. *Id.* In a second affidavit, Hunter added that "[t]he decision by NASCAR to place Mr. LaJoie in first place was made in good faith, without knowledge of any disqualification, and in an attempt to interpret and apply the NASCAR rules to a difficult situation created by a wrong scoring decision at the outset of the race." *Id.* at 148. In their amended complaint, plaintiffs did not allege that NASCAR acted in bad faith or illegally. *See id.* at 22–25. Indeed, the district court implicitly acknowledged that the national officials acted in good faith. Specifically, the court noted that the national officials believed that the local offi-

404

cials' decision to penalize LaJoie in connection with the lap 68–71 incident resulted in part from the scoring error the local officials made in connection with the lap 1–2 incident. *See id.* at 192. The national officials therefore thought that it was appropriate to correct both decisions. Moreover, as we noted in *Koszela,* 646 F.2d at 757 n. 13, it is common practice to refer race procedure questions to the national NASCAR office. We thus believe that the district court should have deferred to NASCAR's interpretation of its own rules, under which NASCAR had the authority to review and decide the disputed issues.

## CONCLUSION

For the foregoing reasons, we reverse the district court's decision granting the motion for summary judgment of plaintiffs-appellees, vacate the judgment and remand to the district court with directions to grant the defendants' motion for summary judgment and to dismiss the complaint.